In the Matter of William T. PARKER, Bankrupt.

Kenneth B. MASON, Jr., as Trustee in Bankruptcy for William T. Parker, Plaintiff,

v.

EASTMAN KODAK COMPANY and Morgan Guaranty Trust Company, Defendants.

No. BK–76–746.

United States District Court, W. D. New York.

July 23, 1979.

Kenneth B. Mason, Jr., Rochester, N. Y., for plaintiff-appellant.

Nixon, Hargrave, Devans & Doyle, Rochester, N. Y. (William S. Thomas, Jr., Rochester, N. Y., of counsel), for defendants-respondents.

CURTIN, Chief Judge.

This case raises the issue of whether the bankrupt's credits under a qualified Employee Retirement Income Security Act of 1974 [ERISA] pension plan constitute property which passes to the trustee under § 70(a)(5) of the Bankruptcy Act. It is on appeal from a decision of Bankruptcy Judge Beryl E. McGuire of the Western District of New York dated October 31, 1978, finding that the pension credits were not property. For the reasons stated below, the Bankruptcy Judge's decision is affirmed.

The bankrupt, William T. Parker, filed a voluntary petition in bankruptcy in this court on March 5, 1976. Scheduled among his assets was "Kodak Employees' Savings Investment Plan . . . $500." Appellant, as trustee for the estate, commenced an action under the Bankruptcy Act on June 17, 1976, seeking to obtain pension credits accrued during the years 1972–1975 for distribution to the creditors of the bankrupt. Respondents Eastman Kodak Company and Morgan Guaranty Trust Company are the bankrupt's employer and the trustee of the pension plan, respectively. They take the position that the bankrupt has no right or interest in the pension fund and further that the fund is a spendthrift trust beyond the reach of the employee or the employee's creditors, including the trustee in bankruptcy.

The parties have submitted a stipulated statement of facts. The only issues that remain are ones of law, which have been thoroughly briefed and argued before this court. Jurisdiction over the parties and the subject matter exists under §§ 2a(7) and 23 of the Bankruptcy Act. 11 U.S.C. §§ 11a(7), 46.

The pension plan at issue was initiated by Kodak in August of 1960. In addition to Kodak, six of its subsidiaries are also participating employers in the plan. Kodak and its subsidiaries have a policy of declaring wage dividends payable to employees out of current or accumulated profits. The wage dividend payment is in addition to the employee's regular pay and is in the company's discretion, subject to the employee meeting certain employment standards for the year of the declared dividend. Under the plan, an employee who has met certain service requirements can make an irrevocable election to have Kodak contribute all or a percentage of any possible wage dividend which might be declared that year to a trust administered by Morgan, as trustee. The election must be made during an enrollment period ending November 1 of the

year preceding the declaration of the wage dividend. If a wage dividend is declared, cash payments to employees are made by Kodak in March, and the Kodak contributions to the trustee are made in April of the year in which the dividend is declared.

Employees have an option of designating placement of Kodak's contributions in three of four funds, consisting of various types of securities. An employee's interest in a given fund is recorded in terms of units, with the value of each unit in a fund determined by dividing the total assets in the fund by the total number of units held by participants. The securities in the funds are at no time registered in the employee's name.

The plan is a qualified plan under the Internal Revenue Code (26 U.S.C. § 401), and, as such, participating employees are taxed only at distribution. As of January 1, 1976, the plan was amended to bring it within the provisions of the ERISA (29 U.S.C. § 1001). In accordance with these federal requirements, from its inception through its amendment history the plan has contained provisions prohibiting assignment or transfer of participating employees' credits.

Distribution normally occurs upon termination of employment or death. The value of an employee's account will then be paid under one of 16 employee options. Payment is to be made in a lump cash sum unless optional installment payments are elected. Prior to termination of employment, borrowing of up to 50% of the credits on certain of the funds is permitted with the fund then collateralizing the loan. Certain hardship withdrawals can also be authorized.

In the years 1972–1975, the bankrupt elected to have Kodak contribute 25% of his wage dividends declared in the following years to the plan. In each of those years, dividends were declared, and in April Kodak contributed the percentage indicated to

the bankrupt's pension account. These contributions amounted to $524.76 in 1973, $624.34 in 1974, and $689.62 in 1975. In April of 1976, after the petition was filed, $703.59 was contributed. The trustee of the bankrupt's estate now seeks to recover the value of these pension credits.

Section 70a(5) of the Bankruptcy Act provides as follows:

(a) The trustee of the estate of a bankrupt . . . shall . . . be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition [to] . . . (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded, or sequestered . . ..

11 U.S.C. § 110(a)(5).

There are two questions presented on appeal. The first is whether the pension funds claimed by the trustee constitute "property" within the meaning of the above provision of the Bankruptcy Act. Assuming that the funds are property, the second question is whether they were subject to transfer, levy, or seizure within the meaning of the same provision.

In a well-reasoned decision, Judge McGuire found that the pension funds did not constitute property under the relevant cases. He also found that they were not transferable because of the nonassignment provision in the plan.

I concur in Judge McGuire's judgment on the second question for the reasons set forth in his opinion. In accordance with the broad preemption provisions of ERISA contained in 29 U.S.C. § 1144(a), ERISA's prohibition of assignment, id. § 1056(d), preempts any state law to the contrary.[1] What follows is a discussion of the first question.

1. Cases such as AT&T v. Merry, 592 F.2d 118 (2d Cir. 1979), and Cody v. Riecker, 594 F.2d 314 (2d Cir. 1979), finding an implied exception to the antialienation provision for state-ordered support and alimony obligations, are distin-

guishable because they are based on special considerations of family law and do not concern the arms-length debtor-creditor relationship.

The governing legal principles for determining whether an asset is property of the bankrupt are contained in a trilogy of Supreme Court cases: *Segal v. Rochelle*, 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1965), *Lines v. Frederick*, 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970), and *Kokoszka v. Belford*, 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974). These cases indicate that the question is answered by examining the nature of the asset in light of the purposes of the Bankruptcy Act, and is independent of whether it can be transferred, levied upon or seized.

*Segal v. Rochelle* involved a trustee's claim to loss-carryback tax refunds received by the bankrupt after filing the bankruptcy petition based on business losses which occurred prior to filing. The court analyzed the question by outlining and applying the two purposes underlying § 70a(5):

> The main thrust of § 70a(5) is to secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he files his petition. To this end the term "property" has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed.

*Supra*, 382 U.S. at 379, 86 S.Ct. at 515 (citations omitted). This objective is qualified by the conflicting purpose of enabling the bankrupt to obtain a fresh start after bankruptcy:

> However, limitations on the term do grow out of other purposes of the Act; one purpose which is highly prominent and is relevant in this case is to leave the bankrupt free after the date of his petition to accumulate new wealth in the future. Accordingly, future wages of the bankrupt do not constitute "property" at the time of bankruptcy nor, analogously, does an intended bequest to him or a promised gift—even though state law might permit all of these to be alienated in advance.

*Id.* at 379–80, 86 S.Ct. at 515. Applying these principles, the court found that the refund claim was "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupt's ability to make an unencumbered fresh start" that it passed to the trustee in bankruptcy under § 70a(5). *Id.* at 380, 86 S.Ct. at 515.

Subsequently, in *Lines v. Frederick, supra,* the Supreme Court reiterated the proposition that the term "property" should be interpreted in light of the dual purposes of the Bankruptcy Act to serve the interests of both the creditors and the bankrupt. That case involved a trustee's claim to accrued but unpaid vacation pay. The Court reached the opposite result, finding that vacation pay did not pass to the trustee because it did not constitute property. Contrasting the bankrupt's plight in the case at hand to that in *Segal,* the Court observed:

> [T]he respondents here are wage earners whose sole source of income, before and after bankruptcy, is their weekly earnings. The function of their accrued vacation pay is to support the basic requirements of life for them and their families during brief vacation periods or in the event of layoff. Since it is a part of their wages, the vacation pay is "a specialized type of property presenting distinct problems in our economic system." . . .
>
> The wage-earning bankrupt who must take a vacation without pay or forgo a vacation altogether cannot be said to have achieved the "new opportunity in life and [the] clear field for future effort, unhampered by the pressure and discouragement of preexisting debt," . . . which it was the purpose of the statute to provide.

*Supra*, 400 U.S. at 20, 91 S.Ct. at 114.

*Kokoszka v. Belford* made clear that an asset is not necessarily insulated from the trustee simply because its source is wages. There, the debtor after filing his petition received an income tax refund based on overwithholding during the taxable year immediately preceding bankruptcy. Reasoning that the tax refund at issue, unlike vacation pay, was not designed to function as a future wage substitute or to support the basic requirements of life during some future period, the Court held that it was property which passed to the trustee.

Two circuit courts have applied these standards to questions similar but not identical to the issue here. In *Short v. Grand*, 507 F.2d 425 (8th Cir. 1974), the bankrupt was a former teacher who over a seven-year period prior to bankruptcy had accrued retirement credits with the Missouri Public School Retirement System. Prior to filing, he prematurely terminated his employment as a teacher and became entitled to withdraw his pension contributions in a lump sum after a 120-day waiting period. Finding that the pension contributions had strong connections to the pre-bankruptcy past and that receipt was contingent only upon the expiration of a waiting period designed solely for administrative convenience, the court held that the property passed to the trustee.

*In re Nunnally*, 506 F.2d 1024 (5th Cir. 1975), involved navy retirement benefits which were not yet payable to the bankrupt because he had not retired. The bankrupt had not made contributions to the fund and could not withdraw funds in advance. Following *Lines v. Frederick, supra,* the court found that the pension was designed to function as a future wage substitute, payable periodically at a time when the bankrupt might well have few or no other sources of income, and was necessary to enable the bankrupt to obtain a fresh start. The court accordingly held that the property did not pass to the trustee.

The specific question presented for decision is in what way the dual purposes of the Bankruptcy Act would best be served considering the nature of the asset in question. The trustee argues that the pension credits at issue here qualify as property under the above cases for a number of reasons. The deposits are payable in a lump sum upon termination of employment, they represent wage dividends earned in the pre-bankruptcy past, and the bankrupt had the power prior to bankruptcy to designate a beneficiary and to withdraw funds in case of financial hardship. The trustee concludes that the pension credits are similar to a savings account and represent compensation for past performance, not a substitute for future wages.

The respondents take the opposite view, emphasizing that the purpose of ERISA is to protect employees' investments in qualified pension plans so that their contributions are used for support during retirement years. To this end, ERISA contains a provision prohibiting assignment or attachment of pension credits. 29 U.S.C. § 1056(d); *see also* 26 U.S.C. § 401(a)(13). Since the bankrupt's contributions were made to a pension plan which qualifies under ERISA, respondents maintain that the asset is a substitute for future wages within the rationale of *Lines v. Frederick, supra.*

Although the question is not an easy one, I find that the bankrupt's pension credits do not constitute property under the above principles. The first and foremost factor in my decision is the purpose underlying ERISA of preserving income for retirement years.

Through the enactment of ERISA, Congress established a comprehensive federal regulatory scheme designed to protect the growing number of employees who were participating in private pension plans. Finding that "the continued well-being and security of millions of employees and their dependents are directly affected by these plans; [and] that they are affected with a national public interest . . .," 29 U.S.C. § 1001(a), Congress prescribed various disclosure and reporting requirements, participation and vesting standards, fiduciary obligations, criminal penalties and civil enforcement provisions to effectuate the statute's policy of "protect[ing] interstate commerce and the interests of participants in employee benefit plans and their beneficiaries . . .." *Id.* § 1001(b). In the House Report, the purposes of the legislation were described as follows:

One of the most important matters of public policy facing the nation today is how to assure that individuals who have spent their careers in useful and socially productive work will have adequate incomes to meet their needs when they retire. This legislation is concerned with improving the fairness and effectiveness

of qualified retirement plans in their vital role of providing retirement income.

H.Rep.No. 93–807, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.Code Cong. & Admin.News, pp. 4639, 4670, 4676. It is apparent that Congress sought to ensure that anticipated retirement benefits would in fact be available at retirement to function as a source of income to retired employees and their families. I therefore agree with Judge McGuire's conclusion that the bankrupt's pension credits are designed as a substitute for future wages necessary to obtain a fresh start. Judge McGuire stated:

> Do the policies articulated by and inherent in ERISA mesh with the concept of a bankrupt's obtaining a fresh start? The Court believes they do. ERISA and its history cannot be read without sensing the deep Congressional concern that employees be assured of minimal standards of economic well-being during their retirement years. The conclusion that this relatively new social policy, responding to an ever increasing social need, necessarily affects preexisting views of the bankrupt's fresh start would seem inescapable. It is the Court's judgment, therefore, that the pre-ERISA pension credits are not "property" within the meaning of § 70a(5).

It is true that the bankrupt elected to participate in the plan in the years 1972 through 1975, before ERISA became effective. However, at the time at which the bankrupt filed his petition, ERISA was in effect and the plan had been adapted to comply with ERISA. The bankrupt's rights under the plan as of the date of filing were governed by ERISA. The trustee's rights also are controlled by the date of filing rather than the date of election or contribution. 4A *Collier on Bankruptcy* ¶ 70.07 (14th ed. 1977). Accordingly, it is appropriate to analyze the nature of the asset within the framework of ERISA.

A second factor favoring the respondents' position is the contingent nature of the right in question. The bankrupt's right to receive his pension was contingent upon termination of employment, which had not occurred as of the date of filing. Where such contingencies are present, the bankrupt has been denied title to the property even though the compensation was for services rendered before bankruptcy. 4A *Collier on Bankruptcy* ¶ 70.34 (14th ed. 1977); *Wood v. Scott,* 180 F.2d 252 (6th Cir. 1950). This was the situation in *In re Nunnally, supra. Short v. Grand, supra,* is distinguishable because receipt of the pension was merely delayed by the passage of a brief period of time required to process the claim.

Under the Kodak plan, prior to termination of employment, the bankrupt had the power to designate a beneficiary, to borrow against the fund, and to apply to withdraw funds in case of hardship. The trustee argues that as a practical matter these elements of control made the funds accessible to the bankrupt and not contingent, even though he never borrowed against the fund or applied for a hardship withdrawal.

The trustee's position overstates the extent of the bankrupt's control over the funds. The powers were carefully limited in order to take advantage of tax deferral provisions of the Internal Revenue Code. In order to obtain a hardship withdrawal, the bankrupt would have had to show both financial need and a serious medical or casualty emergency. A loan could not exceed 50% of the units credited to the employee's account, was secured by a lien on the fund, had to be repaid within three years, and prevented further participation in the plan.

As Judge McGuire noted, in authorizing degrees of control over pension contributions, Congress also established what it considered were adequate sanctions to chill the exercise of that control. These federally established sanctions and restrictions on the use of funds prior to termination of employment distinguish the pension plan from an ordinary savings account accrued for retirement purposes.

Judge McGuire expressed reservations over the fundamental fairness of using control factors as a basis for decision because the analysis by negative implication sug-

gests that the trustee would succeed to pension funds if one of the contingencies, such as physical disability or economic disaster, occurs on the eve of retirement. In such a case, "it would seem particularly harsh under the *Lines* rationale to have him or her forfeit a pension fund accrued through years of effort." (Decision of Oct. 31, 1978, at 16.) The same could be said for the bankrupt who retires on the eve of bankruptcy. However, these facts are not before the court, and there is no need to express an opinion on them at this time. I note, however, that under the Revised Bankruptcy Act of 1978 (effective October 1, 1979) exempt property includes the debtor's right to receive pension payments after termination of employment "to the extent reasonably necessary for the support of the debtor and any dependent of the debtor." 11 U.S.C. § 522(d)(10)(E).

The trustee cites two bankruptcy court decisions as controlling: *In re Mace*, 4 Bank.Ct.Dec. 94 (D.C.Or.1978), and *In re Wilson*, 3 Bank.Ct.Dec. 844 (N.D.Tex.1977). *In re Mace* involved funds deposited prior to bankruptcy in an Individual Retirement Account [IRA]. *In re Wilson* concerned wages voluntarily contributed by a bankrupt employee to his employer's stock savings plan. In both cases, the funds were treated as property of the bankrupt which passed to the trustee.

These cases are factually distinguishable from this case because they both involved funds which could be deposited and withdrawn at will by the bankrupt. In *Mace, supra,* the bankrupt established an IRA two years before filing. Ten days before filing, the bankrupt deposited $1,000, bringing the total as of bankruptcy to $3,000 plus interest. Under the Internal Revenue Code, an individual who establishes an IRA can deduct amounts contributed to the IRA in determining taxable income and is not taxed upon the income until the time of distribution. 26 U.S.C. §§ 219, 408.

In rejecting the bankrupt's claim that the funds functioned as a future wage substitute, the court emphasized the extent of the bankrupt's control over IRA funds under federal law and the uncertainty that they would be used at a time when a future wage substitute was necessary, in contrast to the vacation pay at issue in *Lines* and the pension in *Nunnally.* A primary consideration was the bankrupt's unrestricted right to withdraw the funds prior to retirement, subject only to a 10% tax penalty. Another was the bankrupt's deposit of $1,000 ten days prior to bankruptcy, which could be withdrawn immediately after bankruptcy, suggesting possible fraud or unfair dealing.

The court also rejected the bankrupt's argument that the IRA was exempt under a state law exempting pensions. Its comparison of IRAs and qualified pension plans highlights the extent of the differences between the two types of plans:

Assignment and alienation of pension benefits is severely limited. Internal Revenue Code Section 401(a)(13). IRAs are not subject to the same limitations. *cf.* Internal Revenue Code Section 408(e)(4). Access to pension funds is restricted while an IRA depositor can withdraw funds at any time subject only to a 10 percent extra tax if he does so before reaching 59½ of age. Congress clearly intended to reduce the tax inequities between pension plans and retirement savings, but this was only a very small part of a law to improve existing pension plans and provide greater security and vested rights for employees under qualified pension plans.

*Supra* at 95.

In *In re Wilson*, like *Mace*, the bankrupt could withdraw his contributions from the stock savings plan at any time, losing only the employer's contributions for one year and seniority on the vesting scale for ownership of matching employer contributions.

The judgment of the Bankruptcy Court is affirmed.

So ordered.