In the Matter of Luigi BAVIELLO, Bankrupt.

Dorothy EISENBERG, Trustee, Estate of Luigi Baviello, Bankrupt, Plaintiff,

v.

Luigi BAVIELLO, and First National Bank of Long Island, Defendants.

Bankruptcy No. 78 B 1114.

United States Bankruptcy Court, E. D. New York.

July 1, 1981.

Dorothy Eisenberg, trustee pro se.

Redmond & Pollio, Garden City, N.Y., for defendant First National Bank of Long Island by John T. Redmond, Garden City, N.Y.

Jules V. Speciner, Great Neck, N.Y., for bankrupt.

BORIS RADOYEVICH, Bankruptcy Judge.

By a complaint filed on April 19, 1979, the trustee seeks a judgment directing the surrender and turnover by the First National Bank of Long Island ("the bank") of all funds held by the bank in a so-called "Keogh account" in the name of the bankrupt, Luigi Baviello. The bank and the bankrupt filed answers which deny the material allegations of the complaint. The bank's answer also alleges that the account

cannot be alienated by the bankrupt and asserts, as an "affirmative defense," that the account is not property of the estate. Thereafter, the bank and the trustee arrived at an agreed statement of facts which was filed on November 24, 1980, and in which the parties agreed to submit the issues to this Court. The aforementioned statement of facts is incorporated herein by reference.

The bankrupt, a self employed physician and 54 years of age on the date of the petition, filed a voluntary petition in bankruptcy on May 12, 1978. Included among his assets, although not listed in the schedules of property accompanying his petition, was a Keogh Plan account in his name maintained at the bank. The bankrupt enrolled in this Keogh plan, known as the F & T Keogh Plan (hereinafter "the original F & T plan"), on December 27, 1969. By so doing, the bankrupt agreed that his trust would be bound by the terms of a document entitled "Master Plan and Trust for Self Employed Individuals and Their Employees" and any subsequent amendments thereto. The objective of this plan was the establishment of a trust for the benefit of self-employed individuals and their employees which would qualify, under sections 401 through 418E of the Internal Revenue Code, for the tax exemption created by section 501 of the Internal Revenue Code. The bank and its predecessor, and the F & T Planning Centers, were co-trustees and managers of the plan.[1] Among the powers of bankrupt was the power to direct the trustee-managers to invest, purchase, sell, transfer, pledge and otherwise encumber or dispose of the assets of the trust. The trustee-managers were under a duty to use reasonable care in exercising the foregoing powers. While the original F & T plan provided that no distribution would be made to any owner-employee prior to his attaining 59½ years of age, unless he died or became disabled, the bankrupt nevertheless retained the power to amend the plan or terminate the trust. The plan provided, in this regard, that

> [a]t any time and from time to time, a Participant may withdraw any part or all of the balance of his voluntary contributions by filing a written request with the Manager; provided, however, that it is limited to the lesser of the value of the voluntary contributions or the value of his account.

The only deterrent to the withdrawal of the trust funds by the participant was the unfavorable tax consequence under section 72(m)(5) of the Internal Revenue Code.

The bankrupt, who was the sole beneficiary of this trust, made the maximum annual contributions permitted by law from year to year, and directed the bank to buy and sell stock through specified brokers. The bank complied with these requests, and did not at any time exercise control over the fund's management. The bankrupt did not make withdrawals either of the principal or the income. Although the bank paid the expenses arising from the bankrupt's stock transactions, no other distributions of the fund were made. On the date of the petition, the balance in the bankrupt's Keogh account was $29,205.46.

Upon the adoption in 1974 of the Employee Retirement Income Security Act ("ERISA"), see Act of Sept. 2, 1974, Pub. L. No. 93–406, 88 Stat. 829, it became necessary for the bank to amend the original F & T plan in order to preserve its tax advantages for the bankrupt.[2] Some time prior to the end of May, 1978, the bank amended the original plan. Included among the amendments was the deletion of language which gave the bankrupt authority to make with-

---

1. In 1971, the bank assumed the responsibilities of F & T Planning Centers and became the sole manager and trustee of the Keogh plan in which the bankrupt had enrolled.

2. Only participants in "qualifying plans" are permitted to enjoy the tax advantages provided by the Internal Revenue Code; compliance with ERISA's new requirements (and the regulations of the Secretary of the Treasury) thereby is encouraged. Among the provisions which must be contained in a plan in order to be a "qualifying plan" is an anti-alienation clause. See I.R.C. § 401(a)(13); 29 U.S.C. § 1056(d)(1). See also 26 C.F.R. § 1.401(a)–13. This provision of the new law is discussed infra.

drawals.[3] The bank subsequently submitted the amended plan to the Internal Revenue Service, and asked the I.R.S. for a determination that the plan was a qualified plan. The I.R.S. issued a favorable determination letter on May 31, 1978 (some two weeks after the petition in bankruptcy was filed). By a letter dated July 3, 1978, the bank advised the bankrupt of the determination letter and asked the bankrupt to indicate whether he intended to participate in the amended plan. Prior to July 31, 1978, the bankrupt replied that he intended to continue his participation under the plan as amended.

The question thus submitted to this Court is whether the funds in the bankrupt's Keogh account are property of his estate in bankruptcy which passed to the trustee under section 70(a)(5) of the Bankruptcy Act. For reasons which follow, this Court holds that title to this bankrupt's account passed to the trustee upon the filing of the petition.

### Conclusion of Law

■ The trustee having sustained her burden of proof, the question certified to this Court with the agreed statement of facts, i. e., did title to the bankrupt's Keogh account pass to the trustee under section 70(a) of the Bankruptcy Act, is answered in the affirmative.

### Memorandum

■ Section 70(a) of the Bankruptcy Act, 11 U.S.C. § 110(a), provides (in pertinent part) that

[t]he trustee of the estate of a bankrupt and his successor or successors, if any, upon his or their appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this Act, except insofar as it is to property which is held to be exempt, to all of the following kinds of property wherever located (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded, or sequestered. . . .

Under this section, all property which is specified therein and which is not exempt[4] passes to the trustee by operation of law. In interpreting the scope of this section, the courts have found it impossible to give the word "property" any categorical definition. *See Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966). Instead, the courts must look to the purposes of the Bankruptcy Act in an effort to determine, on a case by case basis, whether a bankrupt's interest in property passes to the trustee under section 70(a) of the Act. *See id.* One such purpose of the Act is to leave the bankrupt free after the date of his petition to accumulate new wealth and have a fresh start in life. *Id.* The main thrust of section 70(a), however, is to "secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he files his petition." *Id.*

---

**3.** The amended plan does not prohibit premature withdrawals. While the parties have stipulated that it is the bank's policy not to permit withdrawls until the participant reaches the age of 59½, the rights of the parties are governed by the F & T Keogh plan and not an unwritten policy of the bank. Accordingly, this Court is of the opinion that the bank's policy is not binding upon the bankrupt or his trustee.

**4.** Under section 6 of the Bankruptcy Act, 11 U.S.C. § 24, exemptions specified by state law are preserved in bankruptcy for the benefit of residents of the respective states. In applying these exemptions, the bankruptcy courts are bound to follow the decisions of courts of the states. *See In re Witlin*, 640 F.2d 661, 663 (5th

Cir. 1981). Under New York law, it is settled that a disposition in trust for the use of the creator is void as against the existing and subsequent creditors of the creator. *See* N.Y. Est., Powers & Trusts Law § 7–3.1 (McKinney 1967). This is consistent with the New York trust exemption statute, which provides as follows:

Any property, while held in trust for a judgment debtor, where the trust has been created by, or the fund so held in trust has proceeded from, a person *other than the judgment debtor*, is exempt from application to satisfaction of a money judgment.

N.Y. Civ. Prac. Law § 5205(c) (McKinney 1978) (emphasis supplied).

Toward this end, the term "property" has been construed liberally to include even property interests which are novel and contingent. *Id. See, e. g., In re Ferwerda*, 424 F.2d 1131 (7th Cir. 1970) (balance in Keogh plan account held to be property of the estate); *Horton v. Moore*, 110 F.2d 189 (6th Cir. 1940) (contingent remainder interest in a trust held to be property of the estate). In order to accommodate these competing ends, a rule of thumb has been developed by which a property interest is considered to be property of the estate under section 70(a) of the Act if it is "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start." *Segal v. Rochelle*, 382 U.S. at 380, 86 S.Ct. at 515.

Applying this standard, the court, in *Matter of Parker*, 473 F.Supp. 746 (W.D.N.Y. 1979), held that the bankrupt-employee's contributions to a qualified ERISA pension plan did not constitute property of the estate which would pass to the trustee in bankruptcy under section 70(a) of the Act. The pension trust at issue in *Parker* was funded by wage dividends declared by the bankrupt's employer. Under the plan, the bankrupt had the right to withdraw funds only in the case of hardship; in order to obtain a hardship withdrawal, the bankrupt would have been required to show to the plan's trustee both a financial need and a serious medical or casualty emergency. In addition, the plan permitted borrowing up to fifty percent of the value of the employee's fund. Such a loan would be secured by a lien on the balance in the fund, would have been required to be repaid within three years, and would have prevented further participation in the plan. Finding that these limitations on the bankrupt's control effectively precluded use of the fund for any purpose other than the future support of the bankrupt and his dependents, the Court concluded that the fund was intertwined with the bankrupt's ability to make an unencumbered fresh start and that it should be preserved for his benefit rather than the estate's.

Factually distinguishable from *Parker* is *Matter of Mace*, 4 B.C.D. 94 (D. Or. 1978).

In *Mace*, the trustee sought a turnover of funds on deposit in an Individual Retirement Account ("IRA") maintained in the name of the bankrupt. The court found that the bankrupt had substantial control over the fund: included among his rights with respect thereto was the right to withdraw the entire fund at any time, subject only to the deterrence of an added tax. Reasoning that the bankrupt's high degree of control over the asset belied the argument that the account was intended to be a substitute for future wages, the Court concluded that his asset should be treated as property of his estate in bankruptcy under section 70(a) of the Act. *See also Short v. Grand*, 507 F.2d 425 (8th Cir. 1974) (retirement credit to which bankrupt presently is entitled is property of the estate); *In re Ferwerda*, 424 F.2d 1131 (7th Cir. 1970) (bankrupt's owner-employee Keogh plan was property of the estate and was not exempt under Wisconsin law).

In the case at bar, an analysis of the original F & T plan shows that the bankrupt had complete control over this asset at all times. Included among his rights under the plan were the rights to withdraw all or part of his contributions (this was limited to the lesser of his contributions or the account balance), and to direct the plan's manager-trustee to buy and sell securities from brokers of the bankrupt's choice. At no time did the bank exercise any control over the fund's management. These are indicia that this fund need not function as a substitute for future wages unlike the plan considered in *Parker* and, as in *Mace*, that the fund is sufficiently rooted in the pre-bankruptcy past to be treated as property of the estate which passes to the trustee on the date of bankruptcy.

██ Neither does the amendment of the plan in 1978 compel the conclusion that the fund is not property of the estate. In view of the foregoing analysis, such an argument would be tenable only if, upon amendment of the plan, the bankrupt lost his formerly unconditional right to withdraw the amount of his voluntary contributions to the fund

(or the account balance, whichever was less). This loss of control might be sufficient to bring the plan within the rule that an asset which is intended to be a future wage substitute, and which is more intertwined with the bankrupt's fresh start than with his pre-bankruptcy past, should not be treated as property of the estate. The argument, however, loses sight of the proposition that an asset should be evaluated as it stood on the date of bankruptcy in determining whether it passed on the trustee. *E. g., In re Parker*, 473 F.Supp. 746, 751 (W.D.N.Y. 1979). If the asset is property of the estate, title to the asset and all powers associated therewith pass to the trustee upon the filing of a petition in bankruptcy. *See* 11 U.S.C. § 110(a)(3), (5). In this case, it was not until May 31, 1978, that the Internal Revenue Service issued its determination letter advising the bank that the amended plan was a qualified plan; the bankrupt's petition, however, was filed some two weeks before the determination letter was issued. In July of 1978, the bank notified the bankrupt of the favorable IRS determination letter and asked the bankrupt if he wished to continue to participate in the plan as amended. Although the bankrupt advised the bank of his consent to participate in the amended plan in July of 1978, the bankrupt was without power to consent since title to the fund and the bankrupt's powers with respect thereto already had passed to the trustee. *See* 11 U.S.C. § 110(a)(3); *Short v. Grand*, 507 F.2d 425 (8th Cir. 1974). Moreover, the bank's communication to the bankrupt, in which it asked for his consent to participate in the amended plan, was more than the gratuitous extension of a privilege: his consent was a condition precedent to his attainment of rights under the Self Employed Individuals Retirement Act of 1962, Pub. L. No.

87–792, 76 Stat. 809, as amended. The Senate Report accompanying H.R. 10 states in this regard that "owner employees must 'consent' to be covered before the specific rules of this bill will apply." S. Rep. No. 992, 87th Cong., 2d Sess. (1962), *reprinted in* [1962] U.S. Code Cong. & Ad. News, 2964, 2974. This is codified in section 401 of the Internal Revenue Code, which provides that in order for an owner-employee plan to be a qualified plan, "contributions or benefits are not [to be] provided to an owner-employee unless such owner-employee has consented to being included under the plan . . . ." I.R.C. § 401(d)(4)(A). Since the bankrupt lost his power to change the nature of his trust on the date of bankruptcy, *see* 11 U.S.C. § 110(a)(3), (5), the evaluation of the trust (as permitting unconditional withdrawals) must stand.

■ The bank argues that the anti-alienation clauses of ERISA, I.R.C. § 401(a)(13) and 29 U.S.C. § 1056(d)(1), and the public policy upon which they are based, preclude the fund from passing to the trustee.[5] Subsection (a)(13) of section 401 of the Internal Revenue Code provides:

A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated. For purposes of the preceding sentence, there shall not be taken into account any voluntary and revocable assignment of not to exceed 10 percent of any benefit payment made by any participant who is receiving benefits under the plan unless the assignment or alienation is made for purposes of defraying plan administration costs. For purposes of this paragraph a loan made to a participant or beneficiary shall not be treated as an assignment or alienation if such loan is secured by the participant's

---

**5.** A short answer to this argument is that ERISA's anti-alienation provisions act only to protect the beneficiaries of qualified plans; the original F & T plan under which the bankrupt's funds were maintained was not a "qualified plan" within the meaning of section 401(a) of the Internal Revenue Code because it permitted voluntary withdrawals. This, indeed, was one of the reasons the bank believed amendment of

the plan was necessary. *See* Agreed Statement of Facts, para. 10; Defendant's Supplemental Brief at 10. The Court prefers not to rest its determination on this ground, however, since the issue of qualification has not been fully argued and briefed by the parties and since Congress has committed the subject matter to the Commissioner of Internal Revenue for determination in the first instance.

accrued nonforfeitable benefit and is exempt from the tax imposed by section 4975 (relating to tax on prohibited transactions) by reason of section 4975(d)(1). This paragraph shall take effect on January 1, 1976 and shall not apply to assignments which were irrevocable on September 2, 1974.

I.R.C. § 401(a)(13). *See also* 29 U.S.C. § 1056(d)(1). The public policy which underlies these clauses has been succinctly stated as follows:

> The purpose of the proscription on alienation is to protect an employee from his own financial improvidence in dealings with third parties. The provision is not intended to alter traditional support obligations but rather to assure that the employee and his beneficiaries reap the ultimate benefits due upon retirement.

*American Tel. & Tel. Co. v. Merry*, 592 F.2d 118, 124 (2d Cir. 1979). There is no question that these anti-alienation clauses have been given "teeth" by ERISA's preemption clause, which provides that "the provisions of this subchapter [including 29 U.S.C. section 1056] . . . shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under 1003(b) of this title." 29 U.S.C. § 1144(a). *See id.* at 120–21. However, the preemption clause also indicates that Congress did not intend ERISA's provisions to supersede federal law: "[n]othing in this subchapter shall be construed to modify, invalidate, impair, or supersede any law of the United States . . . or any rule or regulation issued under any such law." 29 U.S.C. § 1144(d). This language makes it clear that the anti-aliena-

tion clauses may preempt state laws and preclude the use of judgment enforcement devices provided thereunder, *but see American Tel. & Tel. Co. v. Merry*, 592 F.2d 118 (2d Cir. 1979), but they do not preclude passage of title to the trustee in bankruptcy by operation of federal law under section 70(a) of the Bankruptcy Act.[6]

 A final argument, which has not been seriously pressed, is that the trust is exempt under section 6 of the Bankruptcy Act, 11 U.S.C. § 24, which preserves for bankrupts the exemptions of their respective states. No claim to this exemption has been made in the schedules accompanying the bankrupt's petition, *see* Fed.R.Bankr.P. 403, nor could such a claim prevail under the New York law, *see* N.Y. Civ. Prac. Law § 5205(c) (McKinney 1964); *Lerner v. Williamsburgh Sav. Bank*, 87 Misc.2d 685, 386 N.Y.S.2d 906 (1976) (self-settled trust for the benefit of the judgment debtor is not exempt from the satisfaction of a money judgment).[7]

Accordingly, this Court is of the opinion that title to the fund at issue passed to the trustee on the date of the bankruptcy under section 70(a) of the Bankruptcy Act.

Settle judgment in accordance herewith.

---

6. Under sections 522(d) and 541 of the Bankruptcy Code, 11 U.S.C. sections 522(d) and 541, which do not apply to this case, *see* Bankruptcy Reform Act of 1978, Pub. L. No. 95–598, § 403(a), 92 Stat. 2549, pension plans are treated as property of the debtors' estates. Subsection (c)(1) provides, in this regard, that an interest of the debtor in property becomes property of the estate notwithstanding any provision which "restricts or conditions transfer of such interest by the debtor. . . ." 11 U.S.C. § 541(c)(1)(A). An exception, which is provid-

ed for interests in spendthrift trusts, *see* 11 U.S.C. § 541(c)(2) and H. Rep. No. 95–595, 95th Cong., 1st Sess. (1977) 369, U.S. Code Cong. & Admin. News 1978, p. 5787, would not be applicable to a plan such as this bankrupt's under New York law, *see* note 4 *supra*. Section 522(d)(10)(E), however, specifies an exemption for plans which are "qualified plans" under section 401(a), 403(a), 403(b), 408 or 409 of the Internal Revenue Code.

7. *See* note 4 *supra*.