**Roy V. CREASY, Trustee in Bankruptcy for Coleman Furniture Company, Plaintiff,**

v.

**COLEMAN FURNITURE CORPORATION, Defendant.**

Civ. A. No. 86–0272–R.

United States District Court, W.D. Virginia, Roanoke Division.

March 1, 1988.

Roy V. Creasy, Roanoke, Va., Trustee for plaintiff.

Harry S. Rhodes, Roanoke, Va., for plaintiff.

James F. Douthat, Roanoke, Va., George V. Hanna, III, Charlotte, N.C., Joseph B. Shumate, Jr., Pulaski, Va., William M. Mercer–Meidinger, Inc., Richmond, Va., for defendant.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

The principal question presented in this case is whether a debtor who exercised complete control over his firm's pension plan may exclude his interest in the Plan from his Chapter 7 bankruptcy estate under the "non-bankruptcy law" exclusion of 11 U.S.C. § 541(c)(2) or the "federal law" exemption of § 522(b)(2)(A). The court rules that he cannot and denies the debtor's motion to compel the firm's Chapter 7 trustee to pay him his pension interest.

## I. PROCEDURAL HISTORY AND FINDINGS OF FACT

These proceedings revolve around the Coleman Furniture Corporation (CFC), a Virginia corporation, and its president and majority stockholder, Joseph B. Shumate, Jr. (Shumate), a Virginia resident, both of whom are undergoing liquidation pursuant to Chapter 7 of the bankruptcy code. *See also Creasy v. Coleman Furniture Corp.*, 763 F.2d 656 (4th Cir.1985). Roy V. Creasy (Creasy), as Chapter 7 trustee for CFC, originally petitioned this court to employ actuaries to terminate the CFC plan in an adversary proceeding against CFC. Shumate, as a *pro se* intervenor, filed a motion to compel Creasy to pay him his benefits under the plan. John R. Patterson, Shumate's Chapter 7 trustee, was permitted to intervene because he also claimed ownership of Shumate's interest in the pension plan. Although Shumate also had contested the trustee's calculation of his interest in the plan, he and the trustees have agreed to settle that portion of the dispute.[1] Therefore, the only issue before the court is whether to grant Shumate's motion to compel.

The CFC pension plan was created in 1964. Although the original fund documents have been amended and restated since that time, the parties have stipulated that the 1976 pension fund plan documents (plan) govern this case. The plan provides that CFC can terminate the pension fund at any time. Upon termination, the plan allowed a recipient to receive a lump fund payment instead of a life annuity. Shumate has had voting control of CFC from at least 1978 through his ownership of CFC stock and the right to vote other stock held in a voting trust. Therefore, Shumate could have terminated the plan at any time before the bankruptcy and received not only his pension interest, but any excess funds not needed to satisfy the rights of other participants. To date, all participants have made some payment arrangement with the pension except for Shumate. The plan prohibits the alienation of benefits or the transfer of plan assets for the benefit of creditors, as required by 29 U.S.C. § 1056(d)(1) (Employee Retirement Income Security Act (ERISA)) and 26 U.S.C. § 401(a)(13) (Internal Revenue Code).

## CONCLUSIONS OF LAW

Conceptually, the task at hand is easily grasped. Once a debtor files a petition in

---

1. Shumate originally calculated his interest in the plan to be $300,000 while the plan's trustee's figure was closer to $200,000. This dispute over the amount was settled by requiring the trustee to deposit $250,000 in escrow to satisfy Shumate's pension claim. This allowed the plan to settle with all other pension participants. In return for this settlement, Shumate agreed to drop his claims against the trustee for breach of fiduciary duty. Once the right to Shumate's interest is settled and final expenses are paid, approximately $561,000 will revert to Creasy as CFC's bankruptcy trustee.

bankruptcy under Chapter 7, an estate is created. 11 U.S.C. § 541(a) (1985). The estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." *Id.* Notwithstanding these broad provisions, a debtor may exclude certain specifically enumerated assets from the liquidation process. § 522(b). This statutory framework reveals that there are two decision points crucial to Shumate's recovery of his interest in the pension plan. First, the asset must not be included in his liquidation estate. Second, if the asset is part of the estate, he must place it within one of the exclusions. Otherwise, Shumate must deliver the asset to the trustee, § 521(4), who in turn must reduce the property to money in order to settle the claims of all creditors. § 704(1). The court begins first with the issue of whether the pension is part of Shumate's Chapter 7 estate.

### Whether Shumate May Exclude His Interest From the Chapter 7 Estate through § 541(c)(2)

The bankruptcy code includes "all legal and equitable interests" in the bankrupt's estate except as specifically excluded. § 541(a). There is no doubt that a bankrupt's interest in a pension plan is a legal or equitable interest; this conclusion flows from the sweeping language and the accompanying legislative history. *See McLean v. Cent. States, S. & S. Areas Pen. Fund,* 762 F.2d 1204, 1206 (4th Cir.1985). The analysis must therefore focus on the statutory exclusions from the estate.

The only exclusion applicable to Shumate's interest in the CFC pension plan is found in § 541(c)(2) of the code: "A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title." The Fourth Circuit has interpreted the phrase "nonbankruptcy law" to mean state law. *See McLean,* 762 F.2d at 1207–06 (Illinois law controlled to apply § 541(c)(2)). The question then becomes whether the CFC pension trust is a valid spendthrift trust under Virginia law, which governs the plan.

Virginia recognizes spendthrift trusts. Va.Code § 55–19 (1986).[2] To be valid a trust must have "a competent settlor and trustee, an ascertainable trust res and certain beneficiaries." *In re Wilson,* 3 B.R. 439, 442 (Bankr.W.D.Va.1980). The CFC pension plan seems to satisfy these requirements: Article VII of the plan provides for the creation of a trust fund in accordance with a trust agreement incorporated by reference in the plan; Article II defines the beneficiaries as eligible CFC employees; Article VII provides for the funding of the trust res held by the bank; the trust purpose is legal as it is a private pension plan; and Article XII contains a non-assignability provision.[3] *Cf. Parkinson v. Bradford Trust Co. of Boston (In re O'Brien),* 50 B.R. 67 (Bankr.E.D.Va.1985) (Keogh Pension Trust valid under Virginia law but spendthrift provision unenforceable because of settlor-beneficiary relationship).

However, the significant issue in this case is whether the court should deny Shumate his interest in the trust on the authority of a long line of cases which invalidate pension trusts vis-a-vis the debtor for public policy reasons when that debtor is both the settlor and beneficiary of the trust. *E.g., Matter of Goff,* 706 F.2d 574 (5th

2. **Estates in trust subject to debts of beneficiaries; exception for spendthrift trusts.**— Estates of every kind holden or possessed in trust shall be subject to the debts and charges of the persons to whose use or to whose benefit they are holden or possessed, as they would be if those persons owned the list interest in the things holden or possessed as in the uses or trusts thereof; but any such estate, not exceeding $500,000 in actual value, may be holden or possessed in trust upon condition that the corpus thereof and income therefrom, or either of them, shall be applied by the trustee to the support and maintenance of the beneficiaries without being subject to their liabilities or to alienation by them, but no such trust shall operate to the prejudice of any existing creditor of the creator of such trust.

3. The court does not address the $500,000 limitation provided by § 55–19 but assumes, *arguendo,* that there is no problem since only the $250,000 remaining in the plan is at issue and all other claims have been satisfied.

Cir.1983). The Fourth Circuit has adopted this precedent in *McLean* where it is stated: "Moreover, the [pension fund in this case] is not one of those which because settled and revocable by a beneficiary, may not on that account for public policy reasons be protected against the claims of the beneficiary's creditors by anti-assignment provisions." 762 F.2d at 1207. The court later restated its adoption of the doctrine citing *Goff. Id.* at 1208. Therefore, the court rejects the cases Shumate has cited which did not accept the doctrine, *e.g., In re Ralstin,* 61 B.R. 502 (Bankr.D.Kan. 1986), but reviews other cases to determine the doctrine's parameters and whether this case falls within its purview.

The Fifth Circuit in *Goff* seems to have been the first to best articulate the policy. In *Goff,* the court stated that the ERISA-qualified Keogh plan at issue could not be viewed as a spendthrift trust because the self-employed "settlors" had created what was in effect a revocable trust for their own benefit. *Id.* at 580–82. The court believed the provision applied to "traditional spendthrift trusts," *Id.* at 581, a limitation to the language specifically rejected by the Fourth Circuit. *McLean,* 762 F.2d at 1207 n. 1. Other courts have invalidated pension trusts vis-a-vis the debtor in the settlor-sole beneficiary context. *See In re Daniel,* 771 F.2d 1352 (9th Cir.1985) and *In re Graham,* 726 F.2d 1268 (8th Cir.1984) both of which involved physicians who were settlors/sole beneficiaries/trustees of their professional corporation's ERISA-qualified pension plans. This case presents different facts because Shumate was not the settlor of the plan, he was one of approximately 400 beneficiaries, and CFC is not a small professional corporation.

The trustee argues that the doctrine extends to the facts of this case because of the control Shumate exercised over CFC. The trustee points to *In re Lichstrahl,* 750 F.2d 1488 (11th Cir.1985) which involves an M.D.-controlled professional corporation with an ERISA-qualified pension plan. The court held the spendthrift trust was not valid under Florida law because the physician, the plan's major beneficiary, could control disbursements from the plan

through his power of revocation. 750 F.2d at 1490. Under Florida law, this control rendered the trust invalid as such trusts were meant to protect the beneficiary not only from his creditors, but from himself. *See Croom v. Ocala Plumbing & Electric Co.,* 62 Fla. 450, 57 So. 243 (1911); *see also Nixon v. P.J. Pedone & Co. (In re Nichols),* 42 B.R. 772, 776 (Bankr.M.D.Fla.1984). Although *Lichstrahl*'s facts involve a settlor-beneficiary relationship, the case is significant for recognizing the element of control as a bar to enforcing a spendthrift provision in the bankruptcy context. At least one court has provided a good explanation of the control test:

> The degree of control that the debtor may exercise over the trust assets is a crucial factor in determining the issue of inclusion in, or exclusion from, the bankruptcy estate. If the debtor's access to the funds is relatively unfettered, exclusion from the bankruptcy estate would create a temptation to shelter assets in a trust and withdraw them for personal use upon issuance of the bankruptcy discharge. *Matter of Goff,* 706 F.2d at 588. Limited control may be permitted if its exercise would create such hardship for the debtor as to discourage its exercise except in dire circumstances. *See Matter of Baviello,* 12 B.R. 412, 415 (Bankr. E.D.N.Y.1979); *In re Wright,* 39 B.R. 623 (D.S.C.1983). Where the use of the funds would require that the debtor leave employment, become disabled or die it is clear that the funds retain their nature as future earnings rather than present savings. Such provisions should not invalidate an otherwise valid spendthrift trust.

*In re Pettit,* 61 B.R. 341, 346 (Bankr.W.D. Wash.1986).

Courts which have applied the control test have found for and against the debtor. One court invalidated spendthrift provisions when the debtor could obtain the funds he contributed to the plan by showing an immediate and severe hardship which was nothing more than a "mere formality." *In re Monahan,* 68 B.R. 997 (Bankr.S.D.Fla.1982). The debtor was

found to possess too much control when the employer could completely or partially terminate the plan at any time for beneficiary/employees who were also sole stockholders, directors and officers of the employer. *In re Gillett,* 46 B.R. 642 (Bankr. S.D.Fla.1985). However, a debtor did not have too much control over the trust when he had to quit his job to get his money. *Gennet v. ICMA Retirement Corp. (In re Forbes),* 65 B.R. 58 (Bankr.S.D.Fla.1986).

The *Goff* line of cases has been adopted in Virginia. *See In re O'Brien* 50 B.R. 67. *O'Brien* involved a physician who established a Keogh plan with her husband as trustee and herself as the beneficiary. The court ruled that her power to revoke the plan at will was inconsistent with Virginia spendthrift trusts law. 50 B.R. at 77. *O'Brien* was concerned with the strong public policy against allowing someone to place his own property in a spendthrift trust to the detriment of creditors. *Id.* at 74. The court found authority for this policy in *Petty v. Moores Brook Sanitarium,* 110 Va. 815, 67 S.E. 355 (1910) which arose prior to the Virginia spendthrift trust statute but was overruled only to the extent of allowing spendthrift trusts, not for the proposition that a settlor cannot be the beneficiary of his own spendthrift trust. 50 B.R. at 75–76.

This court believes the control test is applicable under Virginia law to determine how much power a beneficiary can exercise over a spendthrift trust before a court will invalidate it. Although there are no Virginia cases on point, as a matter of trust theory, it seems inconsistent that a beneficiary can revoke at will his own spendthrift trust. After all, a spendthrift trust is designed not only to protect the beneficiary from his creditors but from himself. *See In re Wilson,* 3 B.R. 439, 444 (Bkrtcy.W.D. Va.1980). Furthermore, this doctrine is a matter of public policy. *McLean,* 762 F.2d at 1207; *O'Brien,* 50 B.R. at 74. The Virginia Supreme Court was very much concerned with public policy when it interpreted the spendthrift statute in *Sheridan v. Krause,* 161 Va. 873, 172 S.E. 508 (1934). Public policy demands that debtors not be allowed access to their funds to the detriment of creditors in appropriate cases. 50 B.R. at 74.

The facts reveal that Shumate exercised great control over the CFC plan. Before the bankruptcy, he had voting control of the stock and could have voted it to terminate the plan at any time. Upon termination, he, as a plan participant, had the choice of a lump sum payment. He also could have paid himself the reversion of any overfunded amount as a dividend on his stock. Therefore, Shumate's right to the trust assets went far beyond the hardship provisions ERISA allows beneficiaries to have in qualified plans. *See* 29 U.S.C. § 1056. Some courts have held that, although originally not the settlor of the ERISA qualified spendthrift trust, someone who holds such a power of revocation is deemed as a matter of law to be the settlor thereby falling within the *Goff* doctrine. *See, e.g. Hunter v. Ohio Citizens Bank (In re Hotchkiss,* 75 B.R. 115 (Bankr.N.D.Ohio 1987) (although the debtor was only the corporate secretary when the plan was formed, his status as officer and shareholder makes him a settler of the pension trust). Shumate exercised such power over the CFC pension trust that he could control it to suit his needs. Such dominion is inconsistent with the notion of spendthrift trusts.

Shumate argues that he did not control the trust for two reasons. First, he argues he could not terminate the pension plan and pay out the proceeds because he was prohibited from doing so by the terms of a loan agreement he signed with North Carolina National Bank Financial Services (NCNB–FS). This agreement prohibited the removal of collateral from the business or the payment of a dividend over $50,000.[4]

4.    ARTICLE III

*Security*

3.04 The collateral referred to in Section 3.01(a) shall be used for the purpose intended by its purchase in the business of the Company. The Company agrees that such collateral will not be misused or abused, wasted or allowed to deteriorate, except in the ordinary wear and tear of its intended use.

These facts do not change the legal control Shumate exercised over the trust. The trust instrument and any referenced documents control his powers, not the contracts signed with the bank. *See* 19 *Michie's Jurisprudence, Trusts and Trustees,* § 87 (1979). He could still terminate the pension plan and pay the proceeds out as a dividend. Although the consequences of these acts include acceleration of the note and liability for breach of contract, he nonetheless had legal control over the pension plan. Shumate surrendered the control for consideration, namely, the amount of the loan. Therefore, Shumate obtained benefits from rights he had as majority stockholder in control of the corporation. Even if the contract did change the legal right to control the trust, this court believes Shumate would be estopped from asserting an act of his own will as a bar to an exercise of power he lawfully possessed. *See* Restatement of (Second) Agency § 8B (1934).

The second argument Shumate makes for why he did not have control over CFC is that his power over the corporation was wrested away from him by his and CFC's bankruptcies. This argument also fails. The control at issue is that which Shumate exercised *prior* to CFC's November 3, 1982 bankruptcy filing. Even after a Chapter 11 application, Shumate was a debtor-in-possession with all the powers of a trustee. *See* 11 U.S.C. § 1107(a). It was not until the conversion to Chapter 7 in July of 1983

that Shumate lost control of CFC to the Chapter 7 trustee. *See Id.* § 521(3). The loss of control due to the extraordinary event of liquidation does not affect his prior control of CFC from at least 1978.

### *Whether Shumate's Interest in the CFC Plan May be Exempted Under § 522(b)(2)(A)*

■ Once a court has decided an asset is part of the bankruptcy estate, the next step in the analysis is to decide whether the asset may be exempted. At first glance, § 522(d)(10)(E), which exempts pensions, would grant Shumate the relief he seeks. However, § 522(b)(1) allows the states to preclude debtors from claiming the § 522(d) exemptions. Virginia has elected to opt out of these exemptions through § 34–31. *In re Calhoun,* 47 B.R. 119 (Bankr.E.D.Va.1985); *See generally,* J. Reynolds, *How Bankruptcy Exemptions Work: Virginia as an Illustration of Why the "Opt out" Clause Was a Bad Idea,* 8 GMU L.Rev. 1 (1985).

The only remaining exclusion that might apply is found in § 522(b)(2)(A) which exempts any estate property that is exempt under "Federal law."[5] The argument goes as follows: Since the pension plan contains an anti-assignment clause as required by ERISA's 29 U.S.C. § 1056(d)(1) and IRC's 26 U.S.C. § 401(a)(13), Shumate's interest

---

\*  \*  \*  \*  \*  \*

ARTICLE VI
*Negative Covenants*

6.01 Until payment in full of the principal and interest of the Note and all of its obligations under the Financing and Security Agreement, the Company covenants that it will not, nor will it enter into any binding agreement to (without the prior written consent of the Lender):

\*  \*  \*  \*  \*  \*

(h) declare or pay any dividends for any fiscal year on any class of its stock of more than Fifty Thousand Dollars ($50,000.00) in the aggregate other than dividends payable solely in shares of common stock or make any other distribution to any shareholder as such; provided, however, before any dividend payment, after tax profits must exceed debt service by Fifty Thousand Dollars ($50,000.00) for such fiscal year.

Loan Agreement of January 4, 1978 signed by J.B. Shumate.

5. The relevant portions read as follows:

(b) Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate the property listed in either paragraph (1) or, in the alternative, paragraph (2) of this subsection.

\*  \*  \*  \*  \*  \*

(2)(A) Any property that is exempt under Federal law, other than subsection (d) of this section, or State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180–day period than in any other place; and. . . .

is "exempt under federal law" from the bankruptcy estate.

Only a few courts have accepted the argument. *See, e.g., In re Hinshaw,* 23 B.R. 233 (Bankr.D.Kan.1982). The weight of authority is to the contrary. *Goff,* 706 F.2d at 589; *Lichstrahl,* 750 F.2d at 1488; *Graham,* 726 F.2d 1268; *Daniel,* 771 F.2d at 1360–61. ERISA-qualified pension plans do not fall within § 522(b)(2)(A) for at least two reasons. First, the House and Senate reports contain a list of property that can be exempted under federal laws and ERISA is conspicuously absent. *See, e.g.* S.Rep. No. 989, 95th Cong., 2d Sess. 75, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5861. Second, the exempted property relates to "pensions, wages, benefits and payments (which) are all peculiarly federal in nature, created by federal law or related to industries traditionally protected by the federal government. In sharp contrast, ERISA regulates private employer pension systems." *Lichstrahl,* 750 F.2d at 1491 *quoting Graham,* 726 F.2d at 1274. This court adopts the reasoning of the circuit courts which have ruled on the issue and rejects the *Hinshaw* analysis.

## CONCLUSION

The motion to compel CFC's Chapter 7 trustee and plan administrator to pay Shumate his interest in the pension plan is DENIED. First, Shumate may not exclude his interest because the plan qualifies as a spendthrift trust. The control he exercised over the plan is inconsistent with the notion of a spendthrift trust. Furthermore, public policy would be violated if he could deny his creditors access to funds which were essentially a personal savings account. Second, Shumate may not exempt his interest because the plan is ERISA-qualified. Neither the legislative history nor the cases which have analyzed this issue indicate Congress intended to exempt private pension plans from the bankruptcy estate.

The Clerk is directed to send certified copies of this Memorandum Opinion to counsel of record.