**In re Richard Etter BISSELL, Debtor.**

**No. 00–12185–RGM.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Nov. 22, 2000.

Donald F. King, Odin, Feldman & Pittleman, P.C., Fairfax, VA, for Global Advanced Technologies, Inc.

Thomas P. Gorman, Tyler, Bartl, Burke & Gorman, P.L.C., Alexandria, VA, for Debtor.

### MEMORANDUM OPINION

ROBERT G. MAYER, Bankruptcy Judge.

The court is called upon to determine the manner in which the exemption of retirement plans is computed under Section 34–34 of the Code of Virginia where a debtor has an interest in an Individual Retirement Account ("IRA"), a Simplified Employer Plan ("SEP")[1] and a pension

---

1. The debtor scheduled and claimed exempt four retirement accounts: (1) "TIAA/CREF—ERISA" valued at $363,915.13 and claimed exempt pursuant to § 34–34 of the Code of Virginia and 11 U.S.C. § 541(c)(2); (2) "U.S. Government Thrift Savings Plan, ERISA" valued at $164,903.54 and claimed exempt pursuant to 5 U.S.C. § 8437(e); (3) "Schwab SEP–IRA" valued at $38,007.55 and claimed exempt pursuant to § 34–34 of the Code of Virginia and 26 U.S.C. § 408(k); and (4) "Schwab Rollover IRA" valued at $33,530.97 and claimed exempt pursuant to § 34–34 of the Code of Virginia. Global Advanced Technologies, Inc., the debtor's only liquidated unsecured creditor, objected to the claims of exemption of the IRA and the SEP. The parties agree that the federal Thrift Savings Plan is not part of the computation of the maximum exemption allowable under § 34–34 of

plan that satisfies the requirements of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

### The Debtor's Position

The debtor asserts that the maximum exemption allowable under § 34–34 of the Code of Virginia[2] for the IRA and SEP is computed without regard to the ERISA-qualified pension plan. He aggregates the value of the IRA and the SEP and applies the maximum allowable exemption, $52,955.00, against this amount. He acknowledges that since the IRA and SEP have a total value of $71,538.52, the excess over the maximum allowable exemption of the IRA and SEP, $18,583.52, is not exempt under § 34–34.[3] The ERISA-qualified pension plan does not form a part of the computation because it, unlike the IRA and SEP, is not property of the estate. *Patterson v. Shumate,* 504 U.S. 753, 760,

112 S.Ct. 2242, 2248, 119 L.Ed.2d 519 (1992); 11 U.S.C. § 541(c).

### The Creditor's Position

The creditor asserts that the value of the ERISA-qualified pension plan[4] must first be applied to the $52,955.00 amount exempt under § 34–34. Since the ERISA-qualified pension plan has a value of $363,915.13, this method of computing the allowable exemption would exhaust the $52,955.00 exemption allowed under § 34–34. There would be no exemption remaining available for the IRA or the SEP and the full value of the two accounts, $71,538.52, would be turned over to the trustee. The creditor acknowledges that the pension plan is not property of the bankruptcy estate and, therefore, cannot be reached by the trustee. *Patterson v. Shumate,* 504 U.S. at 760, 112 S.Ct. at 2248.

the Code of Virginia. *See In re Hasse,* 246 B.R. 247 (Bankr.E.D.Va., 2000).

2. Section 34–34 provides a limited exemption for retirement plans. It protects retirement plans only to the extent necessary to produce an annual retirement benefit of $17,500. The maximum exemption is derived by multiplying the statutory factor set forth in § 34–34(C), which is based on the age of the debtor at the time the exemption is claimed, by $17,500. In this case, the exemption is $52,955.00. The statute is applied to the aggregate of all "retirement plans" as defined in § 34–34(A) of the Code of Virginia, not to each retirement plan individually. Section 34–34(C) provides:

> The exemption provided under subsection B shall not apply to the extent that the interest of the individual in the retirement plan would provide an annual benefit in excess of $17,500. If an individual has an interest in more than one retirement plan, the limitation of this subsection C shall be applied as if all such retirement plans constituted a single plan.

Va.Code Ann. § 34–34(C).

3. The debtor timely filed a homestead deed and may claim a limited amount of the IRA and SEP exempt under § 34–4 of the Code of Virginia. *In re Ekanger,* 1999 WL 671866 (Bankr.E.D.Va., 1999) ("In addition to the amount that may be claimed exempt under Va.Code Ann. § 34–34, the debtor may take advantage of the 'homestead' exemption pro-

vided by Va. §§ 34–4 and 34–17."); *In re Cathcart,* 203 B.R. 599 (Bankr.E.D.Va., 1996) (Virginia homestead exemption is independent of, and may be claimed in addition to, other available exemptions.)

4. Two statutes require an anti-alienation provision: ERISA and the Internal Revenue Code. *See* 29 U.S.C. § 1056(d)(1); 26 U.S.C. § 401(a)(13); Treas.Reg. § 1.403(a)–13(b)(1).

> One of the primary means by which ERISA protects workers' pension benefits is through restrictions on the assignment and alienation of these benefits. ERISA provides that '[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated.' 29 U.S.C. § 1056(d)(1). In addition, the Internal Revenue Code conditions qualification under ERISA and thus exemption from federal taxation on the non-transferability of pension benefits:
>
> > A trust shall not constitute a qualified trust under this section [26 U.S.C. § 401(a)(13)] unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated.
>
> 26 U.S.C. § 401(a)(13). The Treasury Regulation issued under 26 U.S.C. § 401(a)(13) [Treas.Reg. § 1.403(a)–13(b)(1)] is even more detailed.

*Anderson v. Raine (In re Moore),* 907 F.2d 1476, 1480 (4th Cir., 1990).

The creditor's interpretation of § 34–34 rests on two propositions. The first proposition is that an ERISA-qualified pension plan is a "retirement plan" under § 34–34. The creditor points to the statutory definition of "retirement plan." Va.Code Ann. § 34–34(A). The second proposition is that an ERISA-qualified pension plan that is excluded from property of the estate by 11 U.S.C. § 541(c)(2) is nonetheless claimed exempt under § 34–34. These two propositions lead to the creditor's conclusion that the value of the ERISA-qualified pension plan must be deducted from the exemption otherwise allowed by § 34–34 for an IRA or SEP.

The creditor's interpretation of § 34–34 is contrary to the commonly accepted practice. Statewide continuing legal education seminars treat ERISA-qualified pension plans and IRAs separately, the former under 11 U.S.C. § 541(c) and the latter under § 34–34.[5] Debtors routinely compute the exemption under § 34–34 without regard to the amount of any ERISA-qualified pension plan which is excluded from the bankruptcy estate by virtue of § 541(c)(2). Historically, neither chapter 7 trustees nor creditors objected to this method of calculation.[6] Of course, a common practice does not mean that the practice is correct or that it is immune from challenge. *See, e.g., In re Heath,* 101 B.R. 469, 471 (Bankr. W.D.Va., 1987). The creditor's position recently received judicial support in *In re Gurry,* 253 B.R. 406 (Bankr.E.D.Va., 2000).

## Federal Preemption

The statutory definition of "retirement plan" under § 34–34 appears, at first blush, to include an ERISA-qualified pension plan. The statutory definition is:

*"Retirement plan"* means a plan, account, or arrangement that is intended to satisfy the requirements of United States Internal Revenue Code §§ 401, 403(a), 403(b), 408, 408A, 409 (as in effect prior to repeal by United States P.L. 98–369) or § 457. Whether a plan, account, or arrangement is intended to satisfy the requirements of one of the foregoing provisions shall be determined based on all of the relevant facts and circumstances including, but not limited to, the issuance of a favorable determination letter by the United States Internal Revenue Service, reports or returns filed with the United States or state agencies, and communications from the plan sponsor to participants.

Va.Code Ann. § 34–34(A).[7] However, the matter is not that simple. The effect of federal preemption of pension plans by ERISA must be considered. *See* 29 U.S.C. § 1144(a). Federal preemption in this area is pervasive. ERISA totally occupies the field. Section 1144(a) states:

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chap-

5. *See,* for example, the 1998 Virginia Continuing Legal Education outline which states:

Va.Code § 34–34 was enacted before the U.S. Supreme Court's decision in *Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992) which held that all funds in an ERISA-qualified retirement plan are exempt. *The effect of Patterson v. Shumate is to limit the applicability of Va. Code § 34–34 to IRAs.*

James J. Burns and Donald F. King, *"Introduction to Chapter 7 Bankruptcy," Annual Basic Bankruptcy Seminar: Chapters 7 And 13—The Basics and Beyond,* (Virginia CLE, 1998) (emphasis added).

*See also* Kevin R. Huennekens, *"Practice Strategies for Debtors' Attorneys in Chapter 7,"* *10th Annual Bankruptcy Law Seminar: Hot Topics for the New Millennium—Chapters 7 and 13,* II–A–2 (Virginia CLE, 2000).

6. In *In re Gurry,* 253 B.R. 406 (Bankr. E.D.Va., 2000), the chapter 7 trustee objected to the exemption on different grounds, and when satisfied, withdrew his objection. In this case, the trustee did not initially object to the claim of exemption, but now supports the creditor in its objection.

7. The exemption provided by § 34–34 draws no distinction between IRAs, SEPs and Roth IRAs. While this opinion generally refers only to IRAs, the term includes SEPs and Roth IRAs.

ter shall supersede ... any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

See *Metropolitan Life Ins. Co. v. Mass.,* 471 U.S. 724, 739, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983) ("A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan."); *Powell v. Chesapeake and Potomac Tel. Co. of Va.,* 780 F.2d 419, 421 (4th Cir., 1985); *In re Hanes,* 162 B.R. 733, 741 (Bankr.E.D.Va., 1994).

■ Preemption is so pervasive that state statutes consistent with ERISA but which provide additional protections for workers are preempted. The additional protections are invalidated. New York's Human Rights Law is an example. N.Y. WORK. COMP. LAW § 200–242 (McKinney 1965 and Supp.1982–83). It was "a comprehensive anti-discrimination statute prohibiting, among other practices, employment discrimination" on the basis of gender. *Shaw,* 463 U.S. at 88, 103 S.Ct. at 2895. The New York statute prohibited an employer from maintaining an employee benefit plan that treated pregnancy differently from other non-occupational disabilities. It "had a reach broader than Title VII." *Shaw,* 463 U.S. at 89, 103 S.Ct. at 2896.[8] Relying on ERISA's preemption provision, the Supreme Court held that the provisions of New York's Human Rights Law relating to health care coverage of pregnancy were preempted.[9] The additional protection was not effective. In reaching this conclusion, the Supreme

Court held that federal preemption by ERISA is not limited to state laws specifically designed to affect employee benefit plans or to state laws dealing only with subject matters covered by ERISA, but includes all state statutes that refer to or affect an ERISA-qualified benefit plan. *Shaw,* 463 U.S. at 98, 103 S.Ct. at 2900. Preemption encourages employee benefit plans by eliminating a myriad of state and local regulations each with a different scope and all containing potentially conflicting and inconsistent requirements.

A preemption case of particular interest in this case is *Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988). Georgia enacted a law that prohibited garnishment of employee welfare benefit plans. ERISA treats welfare benefit plans and pension benefit plans differently. Only pension plans are required to contain nonalienability clauses; welfare benefit plans are not. The Supreme Court held that because ERISA occupies the field, the Georgia statute prohibiting garnishment of employee welfare plans was preempted and fully displaced even though it furthered the purposes of ERISA by providing additional protections for workers. The effect of preemption was to permit creditors to garnish employee welfare plans.

In light of the pervasive preemption of ERISA, and particularly in light of *Mackey,* it is clear that the Virginia General Assembly can pass no law that would affect in any way the ability to garnish an ERISA-qualified pension plan. It can neither permit creditors to recover from an ERISA-qualified pension plan nor add pro-

---

**8.** The Supreme Court had previously held that discrimination based on pregnancy was not gender discrimination under Title VII of the Civil Rights Act of 1964. *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), *superseded by statute as cited in Newport News Shipbuilding and Dry Dock Co. v. EEOC,* 462 U.S. 669, 676, 103 S.Ct. 2622, 2627, 77 L.Ed.2d 89 (1983).

**9.** Congress expanded the scope of Title VII to include pregnancy in the Pregnancy Discrimination Act of 1978, Pub.L. No. 95–555, 92 Stat. 2076 (1978), currently codified at 42 U.S.C. § 2000e(k).

tections for debtors not contained in ERISA, such as limiting the enforceability of qualified domestic relations orders against pension plans.

The definition of "retirement plan" in § 34–34(A) must either include ERISA-qualified pension plans or exclude them. If they are included within the definition, the statute would "relate to" ERISA-qualified pension plans and federal preemption must be considered. The effect of preemption may be harsher than expected. Section 34–34 could be preempted in its entirety, leaving no IRA exemption. It is, therefore, necessary to construe § 34–34 to determine whether ERISA-qualified pension plans are included within the statutory definition of "retirement plans" and, if so, the effect of federal preemption; or, whether ERISA-qualified pension plans are excluded from the statutory definition.

*Virginia Rules of Statutory Construction*

■ When an issue of state law has not previously been determined by the state's highest court, as is the situation in this case, a federal court seeks to anticipate how the state's highest court would interpret the statute if it were confronted with it. *See Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782–83, 18 L.Ed.2d 886 (1967) (Where "the underlying substantive rule involved is based on state law … the State's highest court is the best authority on its own law. If there be no decision by that court then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State. In this respect, it may be said to be, in effect, sitting as a state court."); *Food Lion, Inc. v. Capital Cities/ABC, Inc.,* 194 F.3d 505, 512 (4th Cir., 1999). It should use the resources available to the state court and the state's rules of statutory construction. *Wells v. Liddy,* 186 F.3d 505, 528 (4th Cir., 1999); *Phillips v. Chandler,* 215 B.R. 684, 688 (E.D.Va., 1997); 17 MOORE'S FEDERAL PRACTICE § 124.22[6] (3rd ed., 2000). Here, the creditor relies on the plain meaning of the words used in § 34–34. The "plain meaning" rule, though, is but one rule of statutory construction. The Virginia Supreme Court reviewed its rules of statutory construction in *Virginia Soc'y for Human Life, Inc. v. Caldwell,* 256 Va. 151, 500 S.E.2d 814 (1998). It said:

> The rules of statutory construction pertinent to our analysis here are firmly settled. Principal among these rules is that we determine, and adhere to, the intent of the legislature reflected in or by the statute being construed. As an initial and primary proposition, that intent is to be determined by the words in the statute. *See Marsh v. City of Richmond,* 234 Va. 4, 11, 360 S.E.2d 163, 167 (1987). Where the words used in the statute are not sufficiently explicit, we may determine the intent of the legislature 'from the occasion and necessity of the statute being passed [or amended]; from a comparison of its several parts and of other acts *in para materia;* and sometimes from extraneous circumstances which may throw light on the subject.' *Richmond v. Sutherland,* 114 Va. 688, 691, 77 S.E. 470, 471 (1913).

> Additionally, when, as here, the constitutionality of a statute is challenged, our determination of legislative intent is guided by the recognition that '[a]ll actions of the General Assembly are presumed to be constitutional.' *Hess v. Snyder Hunt Corp.,* 240 Va. 49, 52, 392 S.E.2d 817, 820 (1990). Thus, 'a statute will be construed in such a manner as to avoid a constitutional question whenever this is possible.' *Eaton v. Davis,* 176 Va. 330, 339, 10 S.E.2d 893, 897 (1940); *see also Jacobs v. Meade,* 227 Va. 284, 287, 315 S.E.2d 383, 385 (1984). In this context, we will narrowly construe a statute where such a construction is reasonable and avoids a constitutional infirmity. *Pedersen v. City of Richmond,* 219 Va. 1061, 1065, 254 S.E.2d 95, 98 (1979).

*Virginia Soc'y,* 256 Va. at 156–57, 500 S.E.2d at 816–17. Contrary to other rules of construction, in Virginia, an ambiguity in the language of the statute in question is not a necessary prerequisite for resorting to extrinsic aids in construction of the statute when only a narrow construction preserves the validity of the statute. The Virginia Supreme Court stated:

> While an ambiguity of language may serve as the basis for rejecting an unconstitutional interpretation of a statute in favor of one that survives constitutional scrutiny, *see, e.g., Miller v. Commonwealth,* 172 Va. 639, 648, 2 S.E.2d 343, 347 (1939), a finding of ambiguity is not a prerequisite for applying a narrowing construction to preserve a statute's constitutionality. To the contrary, we may construe the plain language of a statute to have limited application if such a construction will tailor the statute to a constitutional fit. *Gooding v. Wilson,* 405 U.S. 518, 520, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).

*Virginia Soc'y,* 256 Va. at 157 n. 3, 500 S.E.2d at 817 n. 3. *See also United States v. Powers,* 307 U.S. 214, 217, 59 S.Ct. 805, 807, 83 L.Ed. 1245 (1939); *Bird v. United States,* 187 U.S. 118, 124, 23 S.Ct. 42, 44, 47 L.Ed. 100 (1902) ("There is a presumption against a construction which would render a statute ineffective or inefficient."); *Earley v. Landsidle,* 257 Va. 365, 369, 514 S.E.2d 153, 155 (1999) ("The legislature's intent must be determined from the words used, unless a literal construction of the statute would yield an absurd result.") This is different from the rule that prevails in interpreting contracts where an ambiguity is a prerequisite to resorting to extrinsic evidence of the parties' intent. *Great Falls Hardware Co. of Reston v. South Lakes Village Center Assocs., L.P.,* 238 Va. 123, 380 S.E.2d 642 (1989).

■ A second rule of statutory construction must also be considered: Exemption statutes are liberally construed in favor of debtors. This rule derives from the fundamental purpose of exemptions which is to "protect the helpless and unfortunate debtor from the importunate and incompassionate creditor." *Linkenhoker's Heirs v. Detrick,* 81 Va. 44 (1885) (homestead exemption). This rule of construction is well rooted in state law. *South Hill Prod. Credit Ass'n v. Hudson,* 174 Va. 284, 6 S.E.2d 668 (1940) (Poor Debtor's Exemption);[10] *Atlantic Life Ins. Co. v. Ring,* 167 Va. 121, 187 S.E. 449 (1936) (disability payments under insurance policy); *Brown's Committee v. Western State Hosp.,* 110 Va. 321, 66 S.E. 48 (1909) (exemption of estate of an insane person from sale, levy or charge for his support in a state mental hospital). It has been faithfully followed by the federal courts. *In re Nguyen,* 211 F.3d 105, 110 (4th Cir., 2000); *Tignor v. Parkinson,* 729 F.2d 977, 981 (4th Cir., 1984); *Cheeseman v. Nachman,* 656 F.2d 60, 63 (4th Cir., 1981); *In re Heidel,* 215 B.R. 814, 817 (Bankr.E.D.Va., 1997) (Bostetter, C.J.) ("It is settled law that the exemption provisions are to be liberally applied in favor of debtors."); *In re Meyer,* 211 B.R. 203, 213 (Bankr. E.D.Va., 1997) (Mitchell, J.); *In re Hayes,* 119 B.R. 86, 88 (Bankr.E.D.Va., 1990) (Shelley, J.); *In re Perry,* 6 B.R. 263, 264 (Bankr.W.D.Va., 1980). Moreover, exemption statutes are remedial. *In re Hasse,* 246 B.R. 247, 253–54 (Bankr.E.D.Va., 2000). Remedial statutes must be construed liberally so as to afford all the relief the legislature intended. *Virginia Dev. Co. v. Crozer Iron Co.,* 90 Va. 126, 135, 17 S.E. 806, 809 (1893).

---

10. *South Hill* defines liberal construction, quoting *Koy v. Schneider,* 110 Tex. 369, 218 S.W. 479 (1920), 110 Tex. 369, 221 S.W. 880, 884 (1920):

> Liberal (or equitable) construction ... expands the meaning of the statute to meet cases which are clearly within the spirit or reason of the law, or within the evil which it was designed to remedy, provided such an interpretation is not inconsistent with the language used; it resolves all reasonable doubts in favor of the applicability of the statute to the particular case.

*South Hill,* 174 Va. at 287, 6 S.E.2d at 669.

With these principles in mind, and considering the pervasive federal preemption in ERISA matters, it is helpful to examine the legislative history of § 34–34 to determine the General Assembly's intent. *Virginia Soc'y*, 256 Va. at 157, 500 S.E.2d at 816–17.

### Legislative History

Virginia opted out of the federal exemptions provided in § 522(d) as permitted by § 522(b)(1) of the Bankruptcy Code. *Simmons v. Peoples Bank of Danville (In re Simmons)*, 27 B.R. 508, 509 (Bankr. W.D.Va., 1983); *In re White*, 11 B.R. 775, 776 (Bankr.E.D.Va., 1981); Va.Code Ann. § 34–3.1. Consequently, in Virginia, the exemptions available are those provided by nonbankruptcy law, for example, federal nonbankruptcy law, the laws of Virginia (principally, Title 34 of the Code of Virginia), and as otherwise provided in the Bankruptcy Code. At the time the Virginia General Assembly opted out of the federal exemptions in 1979, there was no systematic statutory scheme of exemptions. There was no Virginia statute exempting private retirement plans nor was there to be for more than ten years. From the effective date of the Bankruptcy Reform Act of 1978 until § 34–34 first became effective on July 1, 1990, exemption of retirement plans was addressed by various federal and state laws that created federal and state retirement systems, ERISA, § 55–19 of the Code of Virginia, and Virginia common law relating to spendthrift trusts.

The Virginia statutory and common law relating to spendthrift trusts was well developed in 1979. Section 55–19 provided that all trust estates were subject to the debts of the beneficiaries unless the trust included the condition that the corpus and income be held for the benefit of the beneficiary without being subject to the liabilities of the beneficiary and without the right of the beneficiary to alienate his interest in the trust. Three further restrictions were also necessary. The trust must have been for the maintenance and support of the beneficiary; the amount exempt from the beneficiary's creditors could not exceed $500,000; [11] and the trust could not "operate to the prejudice of any existing creditor of the creator of such trust." Va.Code Ann. § 55–19. If these requirements were satisfied, the spendthrift provisions would be honored and the trust would be exempt from the beneficiary's creditors. *See, e.g., Rountree v. Lane*, 155 F.2d 471 (4th Cir., 1946); *Allen v. Wilson (In re Wilson)*, 3 B.R. 439 (Bankr.W.D.Va., 1980); *Alderman v. Virginia Trust Co.*, 181 Va. 497, 25 S.E.2d 333 (1943); *Thomas v. House*, 145 Va. 742, 134 S.E. 673 (1926).

The restriction that the trust could not "operate to the prejudice of any existing creditor of the creator of such trust" is the "self-settled rule" and has been consistently interpreted by Virginia courts to prevent a self-settled trust from being exempt from the settlor-beneficiary's creditors. A spendthrift trust cannot be created by the beneficiary to shield his own assets from claims of his own creditors.

The self-settled trust rule became a growing concern with the increasing popularity of IRAs. All IRAs are self-settled. Moreover, all IRAs and SEPs permit the beneficiary to withdraw retirement funds at any time.[12] Consequently, neither IRAs nor SEPs are spendthrift trusts and neither is exempt from the claims of the beneficiary's creditors. *See Parkinson v. Bradford Trust Co. of Boston (In re O'Brien)*, 50 B.R. 67, 77 (Bankr.E.D.Va., 1985) (Keogh retirement trust did not

---

11. Now $1,000,000. 1998 Va. Acts ch. 214.

12. There is a penalty for early withdrawal. If the withdrawal is before the year in which the individual reached the age of 59½, there is a ten percent excise tax on the premature withdrawal. 26 C.F.R. § 1.408–1(c)(6) (2000).

*See also In re Vogt*, 245 B.R. 53, 57 (Bankr. E.D.Va., 2000). This is not, however, a sufficient restriction on alienation to create a spendthrift trust. *Ekanger*, 1999 WL 671866, at *2.

qualify as spendthrift trust). More ominously, the bankruptcy status of ERISA-qualified pension plans became uncertain.

ERISA was enacted in 1974 and was clearly intended by Congress to preempt the field. 29 U.S.C. § 1144(a). ERISA requires that all qualified pension plans contain an anti-alienation provision. 29 U.S.C. § 1056(d)(1). *See also* 26 U.S.C. § 401(a) (tax-exempt status of ERISA-qualified pension plans requires anti-alienation provision). They are clearly beyond the reach of creditors. ERISA's anti-alienation requirement goes beyond § 55–19. Section 55–19 was limited to $500,000 (now $1,000,000). ERISA is not. Section 55–19 is subject to the self-settled trust rule. ERISA is not.

From 1974 until the effective date of the Bankruptcy Reform Act in 1979, ERISA-qualified pension plans were commonly thought to be exempt from creditors' claims both before and after a beneficiary filed a petition in bankruptcy. *Turpin v. Wente (In re Turpin)*, 644 F.2d 472, 474 (5th Cir., 1981); *Mason v. Eastman Kodak Co. (In re Parker)*, 473 F.Supp. 746, 748 (W.D.N.Y., 1979). Initially, the passage of the Bankruptcy Reform Act of 1978 was not thought to alter this result. *Clotfelter v. Ciba–Geigy Corp. (In re Threewitt)*, 24 B.R. 927, 929 (D.Kan., 1982); *Warren v. G.M. Scott & Sons (In re Phillips)*, 34 B.R. 543, 544–45 (Bankr.S.D.Ohio, 1983).

However, this view was not unanimous. Several cases raised questions that threatened the commonly understood exemption of ERISA-qualified plans from the claims of trustees in bankruptcy. *See Firestone v. Metropolitan Life Ins. Co. (In re Di Piazza)*, 29 B.R. 916, 922 (Bankr.N.D.Ill., 1983); *Samore v. Graham (In re Graham)*, 24 B.R. 305, 312 (Bankr.N.D.Iowa, 1982). The new analysis concluded that while ERISA-qualified pension plans were beyond the reach of creditors before bankruptcy, bankruptcy trustees could reach

the same ERISA-qualified pension plans when the individual filed a petition in bankruptcy. The proponents argued that the reference in § 541(c)(2) to "applicable nonbankruptcy law" did not include federal law. ERISA was federal law, not "applicable nonbankruptcy law," a term by which the proponents meant "applicable *state* law." The trustee was, under this argument, able to reach ERISA-qualified plans unless exempt under state law. Therefore, if a state opted out of the federal exemptions in § 522(d), the ERISA anti-alienation provision did not provide the debtor any protection. Thus, a debtor in an opt-out state had less protection in bankruptcy than outside bankruptcy, a result at odds with Congress' clear intention to protect pension plans.

The General Assembly's concerns were not without foundation. In *McLean v. Central States, Southeast and Southwest Areas Pension Fund*, 762 F.2d 1204 (4th Cir., 1985), the Court of Appeals for the Fourth Circuit was faced with an ERISA-qualified pension plan that had been ordered by a bankruptcy court to pay to the chapter 13 trustee the monthly chapter 13 plan payment. The trustee asserted that § 1325(b) [13] authorized a pay order directed to the pension plan. The pension plan asserted that compliance with such an order would violate the plan's anti-assignment provisions required by 29 U.S.C. § 1056(d)(1) of ERISA and 26 U.S.C. § 401(a) of the Internal Revenue Code, and that the violations would disqualify the pension plan under ERISA and cause it to lose its tax exemption under 26 U.S.C. § 501(a). *McLean*, 762 F.2d at 1206. The court stated that the dispositive issue was whether "the debtor's interest in the trust fund is property of the bankruptcy estate" under § 541(c)(2). *McLean*, 762 F.2d at 1206. The court of appeals reversed the bankruptcy court and held that the pension plan was not property of the estate.

---

**13.** Section 1325(b), which is now § 1325(c), provides that, "After confirmation of a plan, the court may order any entity from whom the debtor receives income to pay all or any part of such income to the trustee."

It did not do so by finding that "applicable nonbankruptcy law" included federal law, that is ERISA, but by finding that the pension plan qualified as a spendthrift trust under Illinois law, the law of the state in which it was organized. *McLean*, 762 F.2d at 1206. The court of appeals was not forced to face the broader issue of what constitutes "applicable nonbankruptcy law" because a decision on narrower grounds, that applicable state law protected the pension plan, resolved the case before the court. Two things concerned the General Assembly. First, the broader question was left unanswered. This could well indicate that the new trend had some validity. The close factual analysis of the terms of the trust, including the source of the funds and the debtor's control over the pension fund, was unsettling when a broader and simpler holding that all ERISA-qualified retirement funds were exempt in bankruptcy—an analysis that does not depend on the factual matters examined in *McLean*—was available. Second, in discussing Illinois law, the court considered the fact that the pension plan was not settled or revocable by a beneficiary and that all contributions were made only by employers. *McLean*, 762 F.2d at 1207. It concluded that "[p]ublic policy concerns would not therefore prevent enforcement of this restriction under controlling nonbankruptcy state law." *Id.* at 1207. These factors are also part of the Virginia self-settled trust rule under common law and § 55–19 of the Code of Virginia.

The General Assembly's concerns were heightened in 1988 by the decision of the United States District Court for the Western District of Virginia in *Creasy v. Coleman Furniture Corp.*, 83 B.R. 404 (W.D.Va., 1988). Coleman Furniture Corporation filed a voluntary petition in bankruptcy. The corporation maintained a pension plan that it had the right to terminate. Upon termination, each employee would receive a lump sum distribution with a present value of the life annuity provided under the plan. If the plan were overfunded, that is, if there were any funds remaining after all the beneficiaries received their lump sum distribution, the surplus would revert to the corporation and be an asset of the bankruptcy estate.[14] The chapter 7 trustee, Roy V. Creasy, sought to do this. The principal shareholder, Joseph B. Shumate, intervened and sought to compel Creasy to pay him his benefits under the pension plan. *Creasy*, 83 B.R. at 405. Shumate was himself in a chapter 7 bankruptcy and his trustee, John R. Patterson, intervened because he claimed ownership of Shumate's interest in the pension plan. *Id.* The district court found that Shumate's bankruptcy trustee was entitled to Shumate's interest in the pension plan, holding that federal law was not included in the term "applicable nonbankruptcy law" in § 541(c)(2) and that the anti-alienation provisions of the ERISA-qualified pension plan were not effective under Virginia state law as to Shumate because Shumate, as the principal shareholder of Coleman Furniture, could have effected the termination of the pension plan at any time. In addition, as the principal shareholder, he was both settlor and beneficiary of the trust. *Id.* at 406–09.

The General Assembly found itself in an unsettled and uncertain world in 1989. It was unsure of the extent to which ERISA-qualified pension plans were exempt in bankruptcy. It was satisfied that IRAs were not exempt. There was a clear difference in treatment of statutory retirement plans for state and federal employees, individuals with only IRAs and individuals with ERISA-qualified pension plans. There was no policy reason to treat an individual differently merely based on the nature of his or her employment. In this climate, the House of Delegates and the Senate agreed to House Joint Resolution No. 284 at the 1989 ses-

---

14. It was estimated that $561,000 would revert to the Coleman Furniture bankruptcy es- tate after satisfaction of all claims of the beneficiaries.

sion of the General Assembly which resolved to appoint a joint subcommittee to "study property exemptions available to debtors against claims of creditors in Virginia." The Subcommittee was directed to complete its work in time to submit its recommendations to the 1990 session of the General Assembly. Va.H.J.Res. 284 (1989). The preamble to the resolution specifically referred to bankruptcy, the fact that Virginia had opted out of the federal exemptions and that, "therefore, a debtor's retirement benefits are subject to creditors' claims." It continued, noting that Texas, Michigan and Illinois had enacted statutes expressly exempting qualified retirement plans, by stating that:

> [T]he federal policy and statutes of other states seem more equitable because they protect from creditors' claims pension plans of self-employed individuals, small businesses and professional corporations that have devoted years to prudent planning for retirement, and whose retirement benefits are a substantial asset of their estate

Va.H.J.Res. 284 (1989).

A joint subcommittee was appointed, studied the issues presented and reported back to the 1990 General Assembly. *See* Report of the Joint Subcommittee Studying Virginia's Exemption Statutes, House Doc. No. 77 (1990) (hereinafter called the "Report"). The Report was a comprehensive examination of exemptions available under Virginia law. Its survey of the then-current law on exemptions started with the observation that:

> Although often referred to as a plan or a scheme, Virginia's statutory exemptions were not enacted with an eye toward creating a body of law to balance debtor and creditor interests. Exemptions have been adopted one-by-one over the years with seemingly little consideration for existing statutes. Most of the exemptions constitute Title 34 of the Virginia Code, but there are many other exemptions which appear throughout the entire Code.

Report at 2.

The survey grouped exemptions into five categories: (1) homestead and poor debtors' exemptions (§§ 34–4 and 34–26, respectively); (2) life insurance and other insurance exemptions (§§ 38.2–3122 and 38.2–3123); (3) tenants by the entirety exemption (§ 55–37); (4) spendthrift trusts (§ 55–19); and (5) miscellaneous exemptions, such as protection against unlimited garnishment (§ 34–29), and protection of public benefits, such as workers' compensation benefits (§ 65.1–82), unemployment compensation benefits (§ 60.2–600), and awards under the Criminal Injuries Compensation Fund (§ 19.2–368.12). Report at 2–5. The Report continued its examination of exemptions with a brief discussion of exemptions created by federal law, such as Social Security payments (42 U.S.C. § 407); Veteran's Administration payments (38 U.S.C. § 301(a)); wage protections of masters, seamen, apprentices and fishermen (46 U.S.C. § 601); death and disability benefits paid under the Longshoremen's and Harbor Worker's Compensation Act (33 U.S.C. § 916); and, exemptions for various civil service retirement benefits and pensions. Report at 5–6. The discussion of federal exemptions was introduced by the statement that, "Although the Bankruptcy Reform Act of 1978 allowed the states to create their own exemptions in bankruptcy, it did not exempt the states from certain other federal debtor exemptions." Report at 5. *See* § 522(b)(2)(A).

The Subcommittee specifically addressed retirement benefits. The Subcommittee noted that Virginia government retirement benefits were statutorily exempt from claims of creditors as were federal pension benefits. It then turned to ERISA and noted the requirement under both ERISA and the Internal Revenue Code that "a pension plan is a qualified plan if it specifically provides that plan participants are prohibited from assigning

or pledging their interests to creditors." Report at 6. The final three paragraphs of this section of the Report dealt exclusively with retirement plans and are one of the keys to understanding the General Assembly's actions and its intentions in initially enacting § 34–34. These paragraphs address the General Assembly's understanding of the state of the law with respect to ERISA-qualified pension plans in bankruptcy in 1990. The Report states:

[A] Virginia debtor who files a petition in bankruptcy is limited to the exemptions available under state law and "applicable non-bankruptcy law." See 11 U.S.C.A. § 541(c)(2), Bankruptcy Reform Act. All property in which a debtor has a legal or equitable interest, at the time of bankruptcy, is brought into the estate. Under the interpretation of a growing number of federal courts of "applicable non-bankruptcy law," qualified retirement plans have been excluded from a debtor's estate only if the plans are enforceable under the state's spendthrift trust laws. However, spendthrift trust laws, as discussed earlier, do not allow a settlor to create a valid spendthrift trust for his own benefit. This debtor-settlor connection is usually present when a sole practitioner, self-employed individual, or professional corporation sets up a retirement plan for its partners, officers, or directors.

Fewer courts have subscribed to a broader interpretation. The Kansas Bankruptcy Court [*In re Ralstin,* 61 B.R. 502 (Bankr.D.Kan., 1986) ] has held that "applicable non-bankruptcy law" includes both the state's spendthrift trust law and ERISA's anti-alienation provisions. The court reasoned that including a professional corporation's pension plan in the debtor's estate would place the bankruptcy trustee in a better position than general creditors, and that the plan's restriction on alienation should be enforceable against the trustee as against general creditors.

The Fourth Circuit has followed the majority view in its interpretation of "applicable non-bankruptcy law." In a 1985 case, the court ruled that the term makes no reference to federal law and, therefore, funds excluded from a debtor's estate are only those allowed under state law (see *McLean v. Central States, Southeast and Southwest Areas Pension Fund,* 762 F.2d 1204 (1985)). In Virginia, as in many other states, this translates to an available exemption of retirement funds where, and only where, the plan itself qualifies as a spendthrift trust. In other words, an employee's interest, in general, will survive bankruptcy as excluded property under a spendthrift trust. However, such trusts established by an owner-employee or a self-employed individual would be self-settled trusts and would not qualify as spendthrift.

Report at 6–7 (footnotes omitted).

The Subcommittee considered this state of affairs and found that "Virginia law is inconsistent as to the application of exemptions to Virginia retirees." Report at 7. It also believed that while ERISA-qualified pension plans were exempt from creditor claims outside bankruptcy, "the bankruptcy code contains no provision which honors this ERISA restriction." Report at 7. In applying the self-settled rule, the Subcommittee concluded that:

Virginia law inadvertently categorizes employee-retirees as (i) beneficiaries of spendthrift trusts and entitled to exemption of their retirement benefits, (ii) beneficiaries of the state retirement plan for public employees and entitled to exemption under specific state law, or (iii) beneficiaries of a self-settled trust and, therefore, not entitled to any exemption.

.   .   .   .   .

The joint committee decided it is in the best interests of the citizens of the Commonwealth to encourage employers to provide retirement plans for their employees. The adoption of a retirement benefits exemption would place employ-

ers and employees on par under the law as retirees and may provide encouragement to employers, as members of the same plan as is established for their employees, to exempt their own retirement funds from the claims of creditors. Report at 8.

The Subcommittee then reviewed the then-existing exemptions and "unanimously agreed that Virginia's current poor debtor's statute is desperately in need of modernization." Report at 9.[15] Finally, the Subcommittee drafted proposed legislation for consideration by the 1990 General Assembly. The legislation was comprehensive and remedial. It modernized the outdated poor debtor's law and proposed a comprehensive treatment for retirement plans not otherwise exempt by law. The General Assembly accepted the proposals, and on April 2, 1990, passed the Subcommittee's bill with minor revisions. The new legislation became effective July 1, 1990.

At the same time that the General Assembly was addressing the issue of retirement plans and was concerned with the court of appeals' decision in *McLean* and the district court's decision in *Creasy*, another case was before the court of appeals, *Anderson v. Raine (In re Moore)*, 907 F.2d 1476 (4th Cir., 1990). The Joint Subcommittee probably was not aware of this case. *Moore* arose from a bankruptcy case filed in South Carolina. The chapter 7 trustee sought to have the administrator of an ERISA-qualified pension plan turn over the debtors' interest in the pension plan. The bankruptcy court held that "applicable nonbankruptcy law" included ERISA and that the ERISA imposed anti-alienation provision in the pension plan excluded the debtors' interest from the bankruptcy estate. *Moore*, 907 F.2d at 1479. The bankruptcy court rested its decision solely on ERISA and did not consider whether the pension plan satisfied South Carolina's spendthrift trust rules. The bankruptcy court's decision was affirmed on appeal to the district court. Neither opinion was published. The chapter 7 trustee took a further appeal to the Court of Appeals for the Fourth Circuit. The case was argued in the court of appeals on April 4, 1990, and decided on July 12, 1990.

The court of appeals affirmed. *Moore* clearly established within the Fourth Circuit the meaning of the term "applicable nonbankruptcy law" as used in § 541(c)(2) to mean "all laws, state and federal, under which a transfer restriction is enforceable." *Moore*, 907 F.2d at 1477. The court continued, "Nothing in the phrase 'applicable nonbankruptcy law' or in the remainder of § 541(c)(2) suggests that the phrase refers exclusively to state law, much less to state spendthrift trust law." *Id.* at 1477. It did, however, acknowledge that four other courts of appeals had reached a contrary conclusion.[16] *McLean* was not inconsistent with *Moore*. Mc-

15. At that time, the exemptions allowed under § 34–26 were a list of household goods commonly found in homes in the eighteenth and nineteenth centuries, for example, 1 cow and her calf, 1 horse, 2 basins, 1 pot, 1 loom, 1 spinning wheel, 1 pair of cards, 1 axe, 200 pounds of bacon or pork, and 25 bushels of rye or buckwheat. The Subcommittee commented on a modern use of the outdated exemptions. One debtor claimed his horse exempt—a two-year-old thoroughbred bay colt named Boogiewoogie Man valued by the debtor at $640,000 at the time he filed his schedules. After the filing of the schedules, Boogiewoogie Man began to "race and has run poorly, finishing last in one race, and next to last in three others. As a result his value has fallen steeply." The debtor estimated the value of the horse at $50,000 at the time of the hearing on the objection to the claim of exemption. *In re Freedlander*, 93 B.R. 446, 450 (Bankr.E.D.Va., 1988). The Subcommittee echoed a then-common observation, "Daily life has changed considerably in the years since the adoption of Virginia's poor debtor's statute." Report at 10.

16. The court acknowledged the contrary results in *In re Daniel*, 771 F.2d 1352 (9th Cir., 1985); *In re Lichstrahl*, 750 F.2d 1488 (11th Cir., 1985); *In re Graham*, 726 F.2d 1268 (8th Cir., 1984); and *In re Goff*, 706 F.2d 574 (5th Cir., 1983). *Moore*, 907 F.2d at 1478.

*Lean,* it said, did not consider whether ERISA constituted "applicable nonbankruptcy law" and had, in fact, rejected a narrow construction of "applicable nonbankruptcy law." [17]

Had the General Assembly known of the pendency of *Moore* and been able to anticipate the court of appeals' holding, it might well have predicted that, at least in the Court of Appeals for the Fourth Circuit, *Creasy* would be reversed. But, *Moore* clearly showed the split of authority at the court of appeals level over the meaning of the phrase "applicable nonbankruptcy law." Although the Fourth Circuit founded its decision on the plain language of § 541(c)(2), four other courts of appeals had found a different meaning. *Moore,* 907 F.2d at 1478.[18] The split among the circuits presaged a resolution by the Supreme Court.

Meanwhile, *Creasy* was making its way to the Fourth Circuit. It was argued a year later, on April 10, 1991, and decided on August 12, 1991 under the name *Shumate v. Patterson,* 943 F.2d 362 (4th Cir., 1991). The Fourth Circuit reversed. The opinion went further than *Moore.* It held that:

> [T]his court's holding in *Moore* precludes the fact-based state law inquiry urged by appellees. We think it is not giving *Moore* undue weight to say that it stands for the proposition that all ERISA-qualified plans, which by definition have a non-alienation provision, constitute "applicable nonbankruptcy law" and contain enforceable restrictions on the transfer of pension interests. *Id.* That conclusion rests not on the reality

of the particular beneficiary-settlor-trust relationship in issue, but instead on the status of the plan as ERISA-qualified. Consequently, Shumate's interest in the pension plan should be excluded from the bankruptcy estate under § 541(c)(2). *Shumate v. Patterson,* 943 F.2d at 364–65.

The United States Supreme Court resolved the split among the circuits on June 15, 1992. *Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). It affirmed the Court of Appeals for the Fourth Circuit using the same analysis as the Fourth Circuit had used. The state of the law was now clear. All ERISA-qualified pension plans were excluded from the bankruptcy estate of a plan beneficiary by virtue of the ERISA anti-alienation requirement and § 541(c)(2).

The Virginia General Assembly amended and reenacted [19] § 34–34 three times between 1990 and the filing of the petition in this case—in 1992, 1996 and most recently in 1999. The 1992 amendment changed subsection E with respect to the enforcement of child and spousal support obligations. This change was part of a broader change in child and spousal support changes in the same bill. 1992 Va. Acts ch. 716.

The 1996 change affected subsection D and was a part of a larger bill that clarified and enhanced exemptions available under §§ 34–21, 34–29 and 34–34 of the Code of Virginia. At that time, there was concern that the homestead exemption might be construed to be a once in a lifetime exemption, even if the $5,000 maximum was not exhausted. That is, if a debtor claimed a

---

17. The trustee had argued that § 541(c)(2) was only intended to exclude traditional trusts, not nontraditional spendthrift trusts, that is, modern retirement plans. *Moore,* 907 F.2d at 1478 (quoting *McLean,* 762 F.2d at 1207 n. 1).

18. The district court in *Creasy* had not anticipated the court of appeals' holding either. It relied on *McLean* for the proposition that "The Fourth Circuit has interpreted the

phrase 'nonbankruptcy law' to mean state law." *Creasy,* 83 B.R. at 406 (citing *McLean,* 762 F.2d at 1207–08).

19. Unlike Congress, the General Assembly does not amend an existing statute by adding or deleting specific words; it amends a statute by reenacting the entire statute. In this case, the definition of "retirement plan" contained in § 34–34(A) was reenacted in 1992, 1996 and 1999.

homestead exemption of one dollar, he would never be allowed to claim the balance of the homestead available of $4,999. *In re Howell,* 106 B.R. 99, 104 (Bankr. W.D.Va., 1989) ("[W]e are here dealing with an individual's right to claim the once-in-a-lifetime homestead exemption"). *But see In re Waltrip,* 260 F.Supp. 448 (E.D.Va., 1966) (decided under the Bankruptcy Act of 1898). *In re Edwards,* 105 B.R. 10, 11 (Bankr.W.D.Va., 1989) is particularly instructive. The question was whether a chapter 13 debtor was required to actually file a homestead deed. He had not. In chapter 7 cases, the failure to timely file a homestead deed in the proper jurisdiction is fatal. *Shirkey v. Leake,* 715 F.2d 859 (4th Cir., 1983); *Zimmerman v. Morgan,* 689 F.2d 471 (4th Cir., 1982). The court stated:

> [N]ot only is it unduly expensive to have homestead deeds prepared and to pay the costs of recordation in the local state clerk's offices, it is also burdensome to require a chapter 13 debtor to use his *once-in-a-lifetime homestead exemption* merely for the purpose of listing property he might exempt in a chapter 7 liquidation when it is also unnecessary. If a chapter 13 debtor's plan is confirmed and ultimately consummated, there would not be a need for the filing and perfecting the homestead exemption. There is, accordingly, no need for perfecting the exemption which might in future years become necessary for the debtor and his or her family.

*Edwards,* 105 B.R. at 11 (emphasis added).

The chapter 13 timing issue identified in *Edwards* was resolved in 1990 in the same Act that added § 34–34, but did not resolve the issue of the number of homestead deeds that could be filed. The 1996 General Assembly amended § 34–21 to clarify that while the homestead exemption is limited to a lifetime maximum of $5,000 (plus an additional $500 for each dependent), an individual may claim the exemption in a number of homestead deeds. It is not limited to the filing of a single homestead deed. *See Nguyen,* 211 F.3d at 111.

In addition, § 34–29(d)(1) was amended to delete a provision that limited the protection of § 34–29 to earnings for only the thirty-day period after the funds have been deposited. The change protects earnings as long as they are identifiable and not commingled with non-exempt funds.

Finally, § 34–34 was amended to change subsection D. Subsection D stated before the amendment:

> The exemption provided under subsection B shall not apply to amounts contributed to a retirement plan during the fiscal year of the retirement plan that includes the date on which the individual claims the exemption and for the two preceding fiscal years of the retirement plan. The exemption provided under subsection B shall not apply to the earnings on contributions described in this subsection.

Va.Code Ann. § 34–34(D) (Michie, 1995). The 1996 change added the proviso that the two-year disqualification did not apply if the amounts deposited were exempt prior to being contributed to the retirement plan. This change protected transfers from one IRA to a second IRA and protected those individuals who may have left an employer who maintained an ERISA-qualified pension plan and transferred the pension plan funds to an IRA. Technically, a rollover to a new IRA is a contribution to the new IRA.

The 1996 amendments remedied concerns, furthered the protections already given to Virginia residents and reaffirmed the General Assembly's intention to protect certain assets, especially retirement funds. 1996 Va. Acts ch. 330.

The 1999 amendment added subsection § 34–34(H) which reads:

> A retirement plan established pursuant to §§ 408 and 408A of the Internal Revenue Code is exempt to the same extent as that permitted under federal law for

a qualified plan established pursuant to § 401 of the Internal Revenue Code. However, an individual who claims an exemption under federal law for any retirement plan established pursuant to §§ 401, 403(a), 403(b), 409 or § 457 of the Internal Revenue Code shall not be entitled to claim the exemption under this subsection for a retirement plan established pursuant to § 408 or § 408A of the Internal Revenue Code.

1999 Va. Acts ch. 766. This change partially corrected the disparate treatment of different beneficiaries, a disparate treatment similar to that which the Subcommittee identified in 1990. With the state of the law clarified within the Fourth Circuit in *Moore* in 1990 and in *Shumate v. Patterson* in 1991 and definitively resolved by the Supreme Court in *Patterson v. Shumate* in 1992, the General Assembly was no longer concerned with the lack of protection of ERISA-qualified pension plans in bankruptcy or the potential for disparate treatment of ERISA-qualified pension plans outside bankruptcy and inside bankruptcy. Now, all ERISA-qualified pension plans were fully free from claims of the beneficiaries' creditors. They stood on the same footing as public employees. However, while IRAs were protected under § 34-34, the protection was limited to a maximum amount based on the age of the beneficiary. Amounts in IRAs over the exemption limit were subject to the claims of creditors outside bankruptcy and of bankruptcy trustees inside bankruptcy. *Hasse*, 246 B.R. at 250; *Vogt*, 245 B.R. at 57. Just as in 1990, there was a disparate treatment of beneficiaries. For example, two individuals, each with $100,000 in a retirement fund, could be treated very differently. A debtor who is 54 years old when he files a petition in bankruptcy is entitled to claim $52,955 in an IRA exempt. The remaining $47,045 is not exempt. Another debtor with an ERISA-qualified pension plan would retain the entire $100,000 retirement fund. Whether an individual works for a company that maintains an ERISA-qualified pension plan or an SEP-IRA, or must establish his own IRA because the employer has no retirement plan, is somewhat happenstance. Smaller companies tend not to establish ERISA-qualified pension plans because of the expense and reporting requirements. S. REP. NO. 106-411 (2000). There was no good policy reason to favor one type of employment over another. The 1999 amendment sought to lessen this disparate treatment. As long as an individual had either an IRA or an ERISA-qualified pension plan, the entire plan would be protected. An IRA would be exempt under § 34-34(H). An ERISA-qualified pension plan would be excluded from the bankruptcy estate under § 541(c)(2).

### The Creditor's First Proposition: An ERISA-Qualified Pension Plan is a Retirement Plan under § 34-34

■ The creditor argues that the statutory definition of "retirement plan" is clear and unambiguous and that it includes ERISA-qualified pension plans. However, this construction would be self-defeating. Just as a construction of a statute that renders a statute unconstitutional must be eschewed in favor of a construction that upholds the validity of a statute, so too must a construction that would render a state statute void by reason of federal preemption. *Virginia Soc'y*, 256 Va. at 156-57, 500 S.E.2d at 816-17. Here, "a literal construction of the statute would yield an absurd result"—that the very comprehensiveness of the statute causes its invalidity, that is, to be preempted and of no force or effect. *Earley*, 257 Va. at 369, 514 S.E.2d at 155. The statute would be rendered "ineffective." *Powers*, 307 U.S. at 217, 59 S.Ct. at 807.

If § 34-34 had never been amended, the court would be placed on the horns of a dilemma. One horn would be giving effect to the intent of the 1990 General Assembly as expressed in the Subcommittee Report to protect ERISA-qualified pension plans. This would undoubtedly result in applica-

tion of federal preemption under ERISA, the invalidity of the 1990 statute (at least as to ERISA-qualified pension plans and possibly as to IRAs as well) and the frustration of the very objective sought by the General Assembly. The other horn would be ignoring the 1990 General Assembly's intent. While all acts of the General Assembly are presumed constitutional and effective, in order to give vitality to the statute, the General Assembly's intent would have to be ignored.

■ However, the General Assembly amended the statute three times: once after the Fourth Circuit clarified the law in the Fourth Circuit and twice after the United States Supreme Court settled the law for the entire United States. The court must, therefore, look for the intent not of the 1990 General Assembly, but of a later General Assembly, that is the 1999 General Assembly which last amended the statute. It is the intent of the 1999 General Assembly that matters, not the intent of its predecessors. The circumstances present in 1990, 1992 and 1996 are helpful in construing the statute, but are not controlling in determining a later General Assembly's intent.

When the original retirement exemption was enacted in 1990, there was significant doubt that ERISA-qualified pension plans would be beyond the reach of bankruptcy trustees. The last two amendments occurred when these uncertainties had been definitively resolved. The 1996 and the 1999 amendments had nothing to do with providing ERISA-qualified pension plans with protection in bankruptcy. Both the 1996 and the 1999 statutes strengthened debtors' protection of their retirement plans, which was consistent with the original intent of § 34–34. The 1996 change protected rollovers and transfers between various pension plans. The 1999 change was more fundamental.

While *Patterson v. Shumate* eliminated one problem the General Assembly sought to solve in 1990, it created another. The General Assembly's solution to the uncertain status of ERISA-qualified pension plans in bankruptcy was to create a limited exemption for them and other retirement plans. *Patterson v. Shumate* resulted in the protection of ERISA-qualified pension plans, but without limitation as to amount. Consequently, the nature of one's employment still resulted in different treatment of retirement plans in bankruptcy, a result that the Report sought to change. *See* Report at 8. Public employee pension funds remained fully exempt by their enabling statutes. ERISA-qualified pension plans were now fully exempt outside bankruptcy and did not become part of the bankruptcy estate. IRAs had only a limited exemption. By 1999, an accepted practice developed. It was well known. An individual with both a 401(k) plan and an IRA would retain the entire 401(k) plan and part, or all, of the IRA, the exact amount depending upon his age. The 1999 amendment was designed to come closer to the original objective of eliminating disparities based on one's employment and placing different retirees on par with each other.

The addition of subsection H in 1999 was designed to place individuals with IRAs on the same footing as individuals with ERISA-qualified pension plans. The subsection clearly demonstrates the knowledge of the General Assembly that ERISA-qualified pension plans are not property of the estate and are fully protected both inside and outside bankruptcy.[20] It explicitly acknowledges that ERISA-qualified plans are exempt pursuant to federal law. IRAs are exempt "to the same extent as that permitted under federal law" for 401(k) plans. Va.Code Ann. § 34–34(H). If 401(k) plans were not

---

20. The choice of the word "exemption" in the second paragraph is significant. Nine years earlier, the Report clearly recognized the difference between property that is excluded from the estate and property that becomes property of the estate and is then exempted from the estate. *See* Report at 6, 8.

**420**

exempt under federal law, § 34–34(H) would be meaningless.

The Virginia General Assembly was well aware of the preemption issue. *Mackey* was handed down two years before the enactment of § 34–34 and the Subcommittee specifically addressed the preemption issue in its Report. The Report stated:

> In recommending the adoption of a retirement benefits exemption, the joint subcommittee necessarily considered the issue of whether such an exemption under state law would be preempted by federal law, specifically ERISA. ERISA preempts 'any and all state laws insofar as they may now or hereafter relate to any employee benefit plan.' Although a state exemption of retirement benefits would clearly 'relate to' employee benefit plans under ERISA, the joint subcommittee concluded that such a state exemption should not be preempted by ERISA for the following reasons. ERISA provides in section 514(d) that the Act may not be construed to 'alter, amend, modify, invalidate, impair or supercede any law of the United States … or any rule or regulation issued under such law.' By its own terms, the administration of the U.S. Bankruptcy Code depends upon state exemption statutes. Preempting such state statutes would seriously impair the bankruptcy code, therefore, the joint subcommittee believes that a Virginia exemption would withstand a preemption challenge.

Report at 8.

It is clear from the Report and the text of § 34–34 that the General Assembly did not intend to challenge federal preemption authority in enacting § 34–34 but rather to craft a statute around the preempted area. The Report seeks to reconcile the statute with ERISA. An analysis, however, of *Shaw* and *Mackey* suggests that the Subcommittee's argument would not have been persuasive even though the intent to protect beneficiaries coincided with the objectives of ERISA. Section 34–34 is not limited to ERISA-qualified pension plans. It encompasses retirement plans intended to qualify under 26 U.S.C. § 401, but fail to do so. It covers 401 plans that may be outside the ambit of ERISA. The Report, the additional language "intended to" and the recognized exemption of ERISA-qualified pension plans in the 1999 amendment reflect that the General Assembly intended to legislate in an area that the federal government had not preempted.

These circumstances lead the court to the conclusion that the 1999 General Assembly intended the definition of "retirement plan" not to include ERISA-qualified plans and intended to exclude ERISA-qualified pension plans from the statutory definition in § 34–34(A).[21] If the definition had included them, federal preemption would have eviscerated the statute and could have rendered the entire statute void. The 1999 change clearly shows that the General Assembly knew that 401 plans derive their exempt status from federal law, not § 34–34. The 1999 amendment which change added subsection H also expanded the scope of protected retirement plans by adding Roth IRAs. *See* § 34–34(A) and (H). The uncertainty over ERISA-qualified plans that existed in 1990 was gone. The accepted practice of debtors to exclude ERISA-qualified plans from their bankruptcy estate and claim an IRA exempt under § 34–34 was well known to the General Assembly. The General Assembly sought to eliminate the inequality between 401 plans and IRAs by extending to IRAs the same exemption as a 401 plan. Consequently, the creditor's first proposition, that ERISA-qualified plans are retirement plans within the statutory definition in § 34–34(A), cannot be accepted. To hold otherwise would necessarily void § 34–34 by virtue of federal

---

**21.** The statutory definition controls the use of the term throughout the statute. Words used in a statute, particularly defined terms, have the same meaning in all subsections. *See Moore,* 907 F.2d at 1478.

preemption. Section 34–34(A) must be narrowly construed to avoid an otherwise fatal infirmity that would result from federal preemption and that would thwart the statute's purpose and the General Assembly's intent. *Virginia Soc'y.*, 256 Va. at 157, 500 S.E.2d at 816–17; *Pedersen*, 219 Va. at 1065, 254 S.E.2d at 98.

*The Creditor's Second Proposition: An ERISA-qualified Pension Plan is, for Purposes of § 34–34, Claimed Exempt under § 34–34*

█ The creditor's second proposition is that an ERISA-qualified pension plan, although excluded from property of the bankruptcy estate pursuant to § 541(c)(2), is for purposes of § 34–34, claimed exempt under § 34–34. This proposition is necessary for the creditor's position so that under the second paragraph of § 34–34(H) the ERISA-qualified pension plan prohibits the unlimited exemption of the IRA and is aggregated with the IRA. The creditor argues that there is no difference between property that is excluded from the estate and property that is exempted from the estate. It notes that § 34–34 is available for individuals who file bankruptcy as well as individuals who may utilize an exemption but do not file bankruptcy. Because § 34–34 is available to both bankruptcy debtors and nonbankruptcy debtors, the creditor argues that the difference between excluded from the estate and exempted from the estate is a semantic distinction without a difference.

The argument that there is no difference between exclusion and exemption is not supported by the legislative history and ignores the fact that there is a clearly defined and commonly understood distinction. The Subcommittee's Report draws the distinction between exclusion from the estate and exemption from the estate. *See* Report at 6, 8. The Report discusses the leading cases on the status of pension plans in bankruptcy in 1990. Those cases clearly rely on the difference between exclusion and exemption. Since 1992 when the Supreme Court decided *Patterson v. Shumate*, the distinction has been well known. The suggestion that the General Assembly did not know of the difference in 1990, 1996 or 1999 cannot be accepted. Had the General Assembly intended to somehow include the value of an excluded pension plan in the computation of the amount of the exemption available for an IRA, it could have easily done so. For example, it could have simply stated that the maximum exemption available is reduced by the amount of ERISA-qualified pension plans or any other federal or state pension plan. This method would be simple, direct and not open to question. It would not need the complicated construction proposed by the creditor.[22]

█ There is another reason that the proposition cannot be accepted. A debtor is permitted, but not required, to claim property of the estate exempt.[23] *In re Ford*, 3 B.R. 559, 568 (Bankr.D.Md., 1980), *aff'd sub nom. Greenblatt v. Ford*, 638 F.2d 14, 15 (4th Cir., 1981); 11 U.S.C. § 522(b) ("an individual *may* exempt from property of the estate") (emphasis added). Section 34–34(G) also requires that the exemption under § 34–34 be claimed. It states, "The exemption provided under this section [§ 34–34] must be claimed within the time limits prescribed by § 34–17." Va.Code Ann. § 34–34(G). This subsection has been construed to mean that the debtor must schedule the retirement plan on Schedule C of his bankruptcy schedules within five days after the initially scheduled § 341 meeting. *Heidel*, 215 B.R. at

---

22. Excluding ERISA-qualified pension plans from the statutory definition of "retirement plans" does not render the reference to 26 U.S.C. § 401 in § 34–34(H) of the Code of Virginia meaningless. There are § 401 plans that are not ERISA-qualified. *See Kaler v.*

23. If a debtor fails to claim exemptions, a dependent may claim them. 11 U.S.C. § 522(*l* ).

*Craig (In re Craig)*, 204 B.R. 756 (D.N.D., 1997); *Hanes*, 162 B.R. at 738–40.

818. In *Heidel,* the debtor amended his Schedule C more than five days after the first meeting of creditors and added, for the first time, his IRA which had a value of $39,500. Because § 34–17 requires that the exemption be claimed within five days after the first meeting of creditors, the claim of exemption was disallowed. This case illustrates that the § 34–34 exemption is not automatic. The debtor must claim it.

■■■ The limitation imposed by the second paragraph of § 34–34(H) which is an exception to the general rule set out in the first paragraph of § 34–34(H) is only activated if a debtor "claims an exemption under federal law for any retirement plan established pursuant to §§ 401, 403(a), 403(b), 409 or § 457." The second paragraph permits a debtor who has such a retirement plan and an IRA to choose not to claim the §§ 401, 403(a), 403(b), 409 or 457 plan exempt and benefit from the unlimited exemption then available for the IRA. There is no comparable voluntary choice available to a debtor for an ERISA-qualified pension plan that is excluded from the bankruptcy estate. The General Assembly still chose a word that implies choice and that requires an affirmative action within a 5–day period, the verb "claim." These concepts are closely associated with exempting property from a bankruptcy estate, but are foreign to excluding property from the estate. The debtor need do nothing to exclude property from the bankruptcy estate. It is excluded by statute. 11 U.S.C. § 541(c)(2).

Choice is very important. It is not difficult to imagine a situation where a debtor has an IRA with a value of $100,000 and an ERISA-qualified pension plan with a value of $100. The creditor's construction would inevitably lead to the conclusion that the

IRA may not be claimed exempt under § 34–34(H) because of the existence of the nominal ERISA-qualified pension plan. While the debtor would be able to avail himself of the limited exemption under § 34–34(B), the General Assembly's intent to place IRAs and ERISA-qualified pension plans on an equal footing would be frustrated. Accepting the commonly known distinction between exempting property from a bankruptcy estate and excluding property from a bankruptcy estate prevents this inequitable result.

There are reasons why a debtor may choose not to claim an exemption. While this may be unusual, there may be circumstances where it is desirable. For example, if the debtor knows that he cannot fully exempt both his IRA and his SEP, he may have a preference as to which fund is to be surrendered to the trustee. In these circumstances, he may accomplish this by claiming as exempt the IRA or the SEP that he wishes to retain and not claiming the other exempt. There may be other reasons such as the effect of the relative tax burdens on the debtor individually and on the bankruptcy estate arising from the liquidation of an IRA, particularly if this increases the payment of nondischargeable priority claims.

If a debtor must claim an IRA or an SEP exempt, and may select which IRA or SEP to claim exempt, then it follows that a debtor need not exempt all of his retirement funds. If he need not exempt all of his retirement funds or, indeed any, the distinction between a pension plan that is excluded from the estate and one that is exempted from the estate becomes material. There is no need to claim property exempt from the estate that is excluded from the estate and any such attempt would be unnecessary and futile.[24] Since

---

24. Under the Bankruptcy Code, if an exemption is claimed and allowed, the exempt property ceases to be property of the estate. Property that is successfully exempted passes through the estate. Property that was never property of the estate, does not. The Bank- ruptcy Reform Act of 1978 changed the manner in which exemptions were treated in bankruptcy. Under the Bankruptcy Act of 1898, exempt property never became property of the bankruptcy estate. *Lockwood v. Exchange Bank of Ft. Valley,* 190 U.S. 294, 301,

the General Assembly knew the significance of the difference, it should be given effect.

### Conclusion

The definition of "retirement plan" in § 34–34(A) of the Code of Virginia must be read narrowly to exclude ERISA-qualified pension plans. To hold otherwise would invoke federal preemption which would exclude ERISA-qualified pension plans in any event and possibly preempt the entire statute. It would frustrate the General Assembly's intent to protect retirement plans.

The 1990 General Assembly confronted the inherent problems in using § 55–19 and spendthrift trusts (particularly the self-settled rule) to protect retirement plans. It sought for the first time to comprehensively remedy the problems and to provide greater and better protection for retirees' pension plans, in particular ERISA-qualified pension plans (which it believed were not protected in bankruptcy). Its chosen route was the establishment of a uniform exemption for all retirees.[25] The Supreme Court's subsequent decision in *Patterson v. Shumate* changed one of the underlying assumptions of the General Assembly by definitively holding that ERISA-qualified pension plans were not property of the bankruptcy estate. Had the General Assembly intended to adhere to the uniform exemption for retirees created in 1990, it could have easily amended § 34–34 to expressly reduce the exemption of non-ERISA-qualified pension plans, such as for IRAs and SEPs, that were covered by § 34–34 by the amount of

any ERISA-qualified pension plan excluded from the bankruptcy estate or exempt from creditors in a state court proceeding.[26] It did not. It accepted that ERISA-qualified pension plans could be reached by neither bankruptcy trustees in bankruptcy nor creditors in state court and it expanded the exemptions available based, in part, on this premise. The 1996 General Assembly protected rollover contributions. In 1999, the General Assembly added Roth IRAs. With some restrictions, the 1999 amendment also placed IRAs, SEPs and Roth IRAs on the same footing as 401 plans and other ERISA-qualified pension plans. This partially reduced the inequality between these plans, although it did not completely eliminate it. The creditor's position in this case runs counter to the expanding protections provided by the General Assembly over the last decade and the judicial rule of liberal construction of exemption statutes. Its implicit construction contracts the exemption and magnifies the very inequality the General Assembly sought to minimize.

For the foregoing reasons, the creditor's objection to the debtor's claim of exemption will be overruled. The amount of the exemption of the IRA and the SEP under § 34–34 of the Code of Virginia will be computed without regard to the ERISA-qualified pension plan. The IRA and SEP are exempt in the aggregate amount of $52,955 plus any additional amount allowable under § 34–4.

23 S.Ct. 751, 754, 47 L.Ed. 1061 (1903); Bankruptcy Act of July 1, 1898, ch. 541, § 70, 30 Stat. 544 (repealed 1978).

**25.** Section 34–34 did not include federal or state public employees. They were already protected—although without limit—by statutory exemptions in the statutes that created the pension plans.

**26.** The General Assembly knew the difference between exemptions and exclusions from a

bankruptcy estate. It chose to use the word "exempt." It could have chosen a related, but not identical term, "excluded from the estate." It did not. The choice of the General Assembly, if plain on its face, must be given effect where the construction will not render the statute void. *Shepherd v. F.J. Kress Box Co.*, 154 Va. 421, 426, 153 S.E. 649, 650 (1930). Compare with discussion, above, where the plain meaning of "retirement plan" would cause the statute to be preempted.